Filed 8/6/15; pub. & mod. order 8/26/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G051319 |
| Plaintiff and Respondent, | (Super. Ct. No. DP023353) |
| v. | O P I N I O N |
| N.B., | |
| Defendant and Appellant; | |
| A.K., | |
| Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, Gary Bischoff, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Reversed and remanded with directions.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Respondent.

No appearance for Minor.

*          *          *

## I. INTRODUCTION

N.B. (Mother) is the mother of D.B., who was taken into protective custody in December 2012 at the age of seven. Mother appeals from the juvenile court's order under Welfare and Institutions Code section 364, subdivision (c) (section 364(c)) continuing dependency jurisdiction.[1] She argues that section 364(c) required the juvenile court to terminate jurisdiction because the evidence established continued supervision was unnecessary to protect D.B. from risk of harm. The Orange County Social Services Agency (SSA) agrees with Mother that the juvenile court should have terminated dependency jurisdiction but, unlike Mother, believes D.B.'s father, A.K. (Father), should be granted visitation rights.

We reverse and remand. Section 364(c) states, "[t]he court *shall terminate its jurisdiction* unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (Italics added.) Substantial evidence did not support the juvenile court's finding that the conditions justifying initial assumption of jurisdiction still existed. To the contrary, SSA took the position and proved those conditions no

---

[1] Code references are to the Welfare and Institutions Code.

2

longer existed.  We remand with directions to terminate dependency jurisdiction and to consider appropriate protective orders and visitation orders.

## II.  FACTS AND PROCEDURAL HISTORY

A.  *Initial Dependency Jurisdiction*

D.B. was born in September 2005.  Mother was granted sole legal and physical custody of D.B. in August 2008 as the result of a domestic violence restraining order against Father.  That restraining order expired in February 2009.  From the time Mother was granted sole legal and physical custody of D.B., Father progressively received more frequent visitation and the right to daily telephone contact.

D.B. was taken into protective custody on December 12, 2012, based on allegations of general neglect.  Mother and D.B. were homeless and Mother, who had health problems, had been admitted to a hospital on December 11, 2012.  D.B. was returned to Mother's custody and not detained.

On December 14, 2012, SSA filed a juvenile dependency petition (the Petition) alleging one count of failure to protect under section 300, subdivision (b).  The Petition alleged the following:

*Allegation b-1*:  Mother and D.B. were homeless and, for the past year, had been living in hotels.  Mother had significant health problems requiring hospitalization for treatment.  Although Mother had been released from the hospital, it was unknown whether her continuing treatment would require another period of hospitalization.

*Allegation b-2*:  Mother and Father have a "history of domestic violence," with the last incident occurring six years previously.  D.B. reported that Father yells at Mother and demands information from her.  D.B. did not want to live with Father.

*Allegation b-3*:  On October 24, 2012, in D.B.'s presence, Mother's boyfriend pushed Mother against a wall and threw her onto a bed.

3

*Allegation b-4*:  Father has a history of domestic violence with multiple partners, and there were six known past and present restraining orders against him.  In the past year, Father had been arrested once on domestic violence charges.  He is on probation and, as a probation condition, must enroll in a batterer's treatment program.

*Allegation b-5*:  On July 18, 2012, Father engaged in a "physical altercation" with his girlfriend.  Although a restraining order was issued against Father, he continued to send the girlfriend threatening text messages.

*Allegation b-6*:  Father has a criminal history which includes arrests or convictions for making a false identification to a peace officer, grand theft, burglary, obstructing a public officer, possession of marijuana for sale, battery, spousal battery, prohibited ownership of ammunition, stalking, false imprisonment, and assault with a deadly weapon.

At the jurisdictional/dispositional hearing on January 14, 2013, the juvenile court found the allegations of the Petition (as amended by interlineation) to be true by a preponderance of the evidence and declared D.B. to be a dependent child of the court.  Physical and legal custody remained vested with Mother under a family maintenance plan.  The court approved SSA's recommended visitation plan and case plan, which provided services for both Mother and Father.

B.  *Supplemental Petition and Detention*

Unfortunately, just two weeks after the jurisdictional/dispositional hearing, D.B. was removed from Mother's custody.  On January 29, 2013, D.B. found Mother unconscious in their motel room, and, after D.B. called 911, Mother was taken to the hospital, where she tested at a blood-alcohol level of 0.368.  The day before Mother was hospitalized, Father's probation officer informed SSA that Father was likely to be deemed in violation of his probation and brought into custody.

4

SSA filed a supplemental juvenile dependency petition on January 31, 2013 (the Supplemental Petition).  The Supplemental Petition alleged (as amended by interlineation):  "On January 29, 2013, the child, D[.B.], found [Mother] unconscious in their motel room.  [M]other was hospitalized where it was determined [M]other had a blood alcohol level of .368 and also tested positive for benzodiazepines.  [M]other was not able or willing to state how much alcohol she consumed.  On January 28, 2013, [D.B.] was kept home from school as [M]other did not 'feel well.'  [¶] . . . [M]other's mental status is currently being evaluated due to her level of intoxication upon her hospitalization and her statement that she would stop taking her medication for her medical issues and let herself die if [M]other was to lose her daughter.  [¶]  [F]ather reported to probation that he has a medical marijuana card and takes marijuana for pain.  Further, [F]ather had maintained contact with his girlfriend in violation of an existing restraining order, and has not yet enrolled in a batterer's treatment class."

At the detention hearing on February 1, 2013, the juvenile court removed D.B. from Mother's custody and vested custody with SSA.  On March 18, 2013, the court found the allegations of the Supplemental Petition (as amended by interlineation) true by a preponderance of the evidence.

C.  *D.B. Returned to Mother's Care*

During the next 12 months, Mother had her ups and downs, but overall made progress in her case plan.  In May 2014, Mother graduated from an alcohol and drug abuse program.  Her case manager stated Mother attended every session of the program, tested negative for drugs and alcohol, and acknowledged her addiction.

D.B. was placed in foster care and, in June 2013, was placed with a nonrelated extended family member.  D.B. missed Mother and wanted to go home with her.  In April 2014, D.B. began a trial visit with Mother, who was living in an apartment provided through a shelter organization.  By June 2014, Mother was complying with all

residence rules and was attending her classes, medical appointments, and counseling. Mother was attending conjoint therapy with D.B. and made sure she attended school. Mother was overall healthy, had "minimal physical health issues," and was not on any medications.

As of June 9, 2014, Father had a stable residence with family members, was working full time, and had reliable transportation, but was subject to restraining orders. He met with his probation officer monthly and followed the conditions of probation.

D.B.'s trial visit with Mother was successful, and, in the June 9, 2014 status review report, SSA recommended formal return of custody to Mother with continued supervision. On June 9, 2014, the juvenile court ordered D.B. returned to Mother's custody and found that both Mother and Father had made substantial progress toward alleviating or mitigating the causes necessitating placement.

D. *The Section 364 Six-month Review Hearing*

The section 364 six-month hearing was conducted on January 7, 2015.[2] The juvenile court received in evidence an SSA status review report dated December 8, 2014 (the 12/8/14 Report), an SSA addendum report dated January 7, 2015 (the 1/7/15 Addendum Report), and an ex parte application filed on September 22, 2014. Social worker Deborah Mathy and Father testified. Father requested admission of the June 9, 2014 status review report. The court noted that report had been admitted at a prior hearing but it would be considered received in evidence to the extent counsel wished to rely on it.

---

[2] Section 364 sets forth procedures for review hearings for a child who has been adjudged a dependent child but has not been removed from parental custody. Section 364 also governs review hearings for a dependent child who, having been removed from parental custody, is placed back in the custody of one parent. (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650.)

1. *The 12/8/14 Report*

The 12/8/14 Report presented the following facts.

In November 2014, Mother and D.B. moved to a new residence in San Bernardino County. D.B. has her own bedroom and bathroom. Mother is employed full time. She has reliable transportation and will ensure that D.B. continues visiting Father. Mother is healthy, has minimal physical health issues, and is not on any medications.

Father has a stable residence with family members, was working full time, and had reliable transportation. Father's probation officer reported no major problem with Father except for finances. When the probation officer asked Father to provide a paystub to verify employment, Father said he had been fired.

Mother and D.B. attend conjoint therapy once a week. The therapist reported they attend sessions consistently and actively participate. Mother regularly underwent drug testing and had no positive tests. She has regularly attended 12-step program meetings and has completed all steps. Mother's cooperation with her case plan and efforts toward alleviating or mitigating the causes necessitating court intervention were substantial.

Father's cooperation with his case plan and efforts toward alleviating or mitigating the causes necessitating court intervention were moderate. Father had completed a domestic violence program. But, after completing the program, he was incarcerated in September 2014 for a domestic violence incident. Father's probation officer reported that Father will not have additional services because he had violated his probation. The probation officer was concerned about Father maintaining stable employment, and Father had not provided a copy of a paystub.

Father tested positive for THC on six occasions in July and August 2014. Father had a medical marijuana prescription that expired on August 4, 2014. Mathy contacted the office of the prescribing physician and was informed the doctors do not speak about their clients on the phone. Mathy asked Father to call the physician's office

7

for clarification. Father said he was offended by the call and wanted to speak with Mathy's supervisor.

Father has made progress toward his case plan requirements. He visits D.B. on a weekly basis. He has stable housing and reliable transportation. He follows up on D.B.'s educational progress. Father had visited D.B. for eight hours of supervised visitation per week until he was incarcerated. After Father's incarceration, he was approved for six hours of supervised visitation, which was moved to a visitation center. There were issues with visitation. Father sometimes arrived early, sometimes late, and sometimes did not interact with D.B. as much as he probably should have. But overall, the evidence was that visits with Father were happy and successful. Father expressed his love for D.B. She would hug Father and say, "I love you."

On August 21, 2014, Mathy reported: "[F]ather emailed the undersigned stating that he has not spoken to [D.B.] in three days and [M]other's attorney cannot make the decision to not let the child speak to [F]ather without filing a motion. [F]ather also left the undersigned four voicemails stating that he met with his probation officer who will be doing a welfare check on [M]other and [D.B.]. [F]ather reported that this could constitute kidnapping and he can file charges since he does not know where [D.B.] is currently located."

Under assessment/evaluation, the 12/8/14 Report stated: "[M]other maintains communication with the undersigned, calling with questions or to report progress. . . . Although [M]other gets upset at times and does not understand why visits with [F]ather need to take place due to his verbally aggressive behavior or because the child refuses; [M]other makes every effort to follow through with visitation. [M]other communicates her struggles and also her successes. . . . [M]other takes ownership when she needs to and also asks for help. [¶] During this reporting period [F]ather has been incarcerated due to violation of probation. [F]ather reported that no charges were filed so he did nothing wrong; however the probation officer reported that [F]ather violated his

8

probation and that is why he was incarcerated. The probation officer is also having difficulty verify[ing F]ather's employment. . . . [¶] Counseling for [F]ather could not be initiated due to [F]ather's limited availability. . . . [¶] Difficulties during this reporting period included visitation. Visitation guidelines were not being followed thus visitation was moved to a visitation center. [F]ather . . . , prior to his incarceration, informed the undersigned that he worked two jobs and was not off until 8:00[]pm every day. After his incarceration, [F]ather reported that he worked until 6:30[]pm. [F]ather also informed the undersigned that he could not meet on Saturdays until after 12:00[]pm. Visitation centers are only open until 8:00[]pm on weekdays and 4:00[]pm on Saturdays thus it was difficult for [F]ather's limited availability to accommodate visitation. The undersigned offered [F]ather six hours of visitation and attempted to keep the visitation as close to the same prior to the visits at the visitation center; however [F]ather could no longer attend Wednesday's visitation. [F]ather could not provide the undersigned or his probation officer with proof of employment. It is unknown where [F]ather is employed at this time. There was a period of time when [D.B.] and [F]ather were not speaking on the phone; this has been resolved and they now communicate on the telephone. Visitation occurs weekly with no concerns reported. Since moving out of the county [M]other ensures [D.B.] attends visitation with [F]ather."

The 12/8/14 Report noted that, during the reporting period, Father had engaged in "verbally aggressive behavior[] such as threatening to make false allegations against [M]other, name calling, raising his voice, yelling at [D.B.], stating he was going to hire a private investigator to spy on [M]other, and screaming on his voice messages to [M]other and the undersigned." Father's behavior and domestic violence history prompted the social worker to request that monthly contacts be held at the social worker's office. Father declined meeting in person with the social worker and requested that all communication be made by e-mail.

9

As to D.B., the 12/8/14 Report concluded: "[D.B] continues to have good days and bad days. [She] likes having her own bedroom and seeing [F]ather. During this reporting period [D.B.] was able to verbalize that she needed a 'time out' from [F]ather due to him not engaging with her during visitation and also hurting her feelings. [D.B.] has gotten physically aggressive by kicking the back seat of the car when traveling to visitation but once arrived, the visit concluded without problems. [D.B.] informed the undersigned that she does not want to hurt either of her parents and does not understand why they have to [be] mean to each other."

In the 12/8/14 Report, SSA recommended termination of dependent child proceedings with "[e]xit orders."

2. *The 1/7/15 Addendum Report*

The 1/7/15 Addendum Report presented the following facts.

Mathy met with Mother and D.B. on December 24, 2014. D.B.'s room was clean and D.B. was excited to show Mathy her Christmas gifts. No signs of maltreatment were observed or reported. D.B. reported that she visits with Father, but he does not play with her. D.B. talks on the phone with Father, but he does not ask about her day, which makes her sad. D.B. wants the case closed. She feels safe with Mother in their new home and likes her new school.

Mother felt anxious about the upcoming review hearing. She had worked hard to complete her case plan and prove to the court that D.B. is safe in her care. Mother would like Father to be "consistent" in D.B.'s life but wants him to be a positive influence. Mother reported that D.B. was doing well overall and adjusting to her new school, and D.B.'s negative behavior, such as talking back, had decreased. D.B. felt stability and knew Mother could keep her safe. Mother was able to articulate the work she had accomplished and, although it had been a difficult couple of years, Mother was proud of herself and D.B., and was looking forward to the future.

10

Father and Mathy continued to communicate only by e-mail, as Father had requested. Father reported he had not been receiving his full six hours of visitation and now could visit D.B. after 6:30 p.m. on Wednesdays. Mathy explained that the family lost its Wednesday spot at the visitation center and a new referral would be necessary.

The 1/7/15 Addendum Report provided a summary of D.B.'s visits with Father on November 22 and 29, and December 6, 13, 20, and 27, 2014. Father did not show for the December 13 visit. No problems were reported for the other visits except that the quality of visits was "inconsistent." Father did not "engage with [D.B.]" and spent visitation time on his cell phone. Father's limited availability "caused a barrier to complete all of the weekly visitation hours."

Mother continued to meet the requirements of her case plan and felt confident she could provide a safe home for D.B. Father continued to visit D.B. and communicate his schedule to Mathy.

In the 1/7/15 Addendum Report, SSA made the same recommendation as in the 12/8/14 Report: terminate dependency proceedings with exit orders.

3. *Mathy's Testimony*

Mathy testified she was assigned to the case in January 2013. She confirmed her recommendation to terminate dependency proceedings. Mathy had no concerns about leaving D.B. in Mother's care. Mother had completed her case plan and needed no other services to keep D.B. safe.

To Mathy's knowledge, Father had stable employment and housing. Mathy believed D.B. would benefit by having a relationship with Father in the future and Father should be involved in D.B.'s life. Mathy recommended continued visitation with Father, with visitation to include other members of Father's family. Mathy also believed that Father should be involved in making life decisions for D.B.

11

According to Mathy, Father's visits with D.B. were appropriate, although Mathy thought Father should interact more with D.B., and there had been banter between Father and D.B., which was not appropriate. Father neither physically nor mentally abused D.B. Mathy's only fear about leaving Father alone with D.B. is that he would badmouth Mother in front her. Also, Mathy testified, Father had raised his voice to her and to Mother and "has texted and had some verbal altercation on the phone with [D.B.]," and Mathy did not want a continuation of that behavior. In light of the incident in September (which led to Father's incarceration), Mathy was fearful that Father would physically abuse an adult in front of D.B.

Mathy expressed concern over "the whole overall quality" of Father's visits with D.B. Mathy testified: "Even before he went to a supervised center, D[.B.] would talk to me a lot about the lack of engagement and he would just be sitting around and—or talk negatively or say that he's going to have something done, like have the cops called on [M]other, or just words being exchanged that I don't think a child should be put in the middle of." The lack of engagement made D.B. feel as though Father would rather be doing something other than visiting her.

Mathy testified that D.B. loves Father and wants to see him. Father had expressed a commitment and desire to see D.B. regularly. Father had gotten angry with Mathy on more than one occasion, as recently as December 2014. Mathy was concerned that Father had "anger issues."

4. *Father's Testimony*

Father testified that he loves D.B., has always played a role in her life, and wants to play a part in raising her. He stressed it is important for him to be involved in D.B.'s education.

Father explained that during visits, he allowed D.B. to play with other children because she liked to play, and he did not expect "a nine-year-old to sit at a table

12

for four hours and talk to me." Father complained there was nothing to do at the visitation center. He brings food to visits but does not bring games. He has suggested to D.B. they read a book or do homework together during visits, but she wants to play, and he is "not a drill sergeant."

Father testified he works for "G Phrase" which is part of Google. When Mathy asked him for information about his employment, Father referred her to his probation officer, to whom he had provided proof of employment. Father lives with his parents. He works from 7:00 a.m. to 4:00 p.m., Monday through Friday, and sometimes works overtime.

Father was incarcerated in September 2014 (he did a "ten-day flash") because his then girlfriend called the police after they got into a fight.

Father acknowledged he refuses to meet in person with Mathy. He claimed he does so because he feels that she is only helping Mother and is not helping him. Father understands his case plan requires drug testing, but acknowledged he was not currently drug testing because "Chuck" told him to stop testing. Father denied having a domestic violence problem even though he had been arrested three times on domestic violence charges. He denied having an anger problem.

Father admitted that he told Mathy he was going to hire a private investigator to follow Mother. He wanted to hire a private investigator out of concern that D.B. was around men he did not know. He admitted talking badly about Mother in front of D.B. in August 2014, but since then has not said anything bad about Mother.

Father owes child support and had not made a child support payment for a year.

E. *The Juvenile Court's Ruling*

After hearing argument of counsel, the juvenile court made comments and findings. The court expressed concern that Father was interested in locating where

13

Mother and D.B. resided and announced it was considering a restraining order against Father to preclude him from going near D.B.'s home or school and to attempt to find out where D.B. lived. The court stated: "[W]hat I'm going to find is . . . that with those things in place, the court believes that the conditions no longer exist and the court finds that the conditions are not likely to exist which caused the court to assume its initial jurisdiction in this matter." Without a restraining order in place, the court found, "I could not make the secondary finding that the conditions are not likely to exist which led to the initial supervision of this case."

The court offered Father an option: If Father objected to a restraining order, the court would continue dependency jurisdiction. The next day, January 12, 2015, Father's counsel objected to a restraining order. Over the objections of Mother, D.B.'s counsel, and SSA, the juvenile court sustained Father's objection, declined to issue a restraining order, and continued dependency jurisdiction. The court ordered Father not to contact Mother directly or indirectly by any mode of communication and ordered him to arrange all visitation through the social worker. The court ordered Father not to attempt to find out "in any way, shape or fashion" the location of D.B.'s home or school or Mother's place of employment, and to immediately contact the social worker if he found out any of that information.

The juvenile court expressed concern over Father's refusal to provide the social worker with basic information, such as proof of employment, and warned Father and his counsel: "When we come back next time, if I don't see a better situation than the one I'm seeing right now, I'm not considering the idea of doing exit orders with visitation. I'm considering terminating the case without contact whatsoever and your client needs to understand that and he needs to start working on these issues so that when we finally do close this case, . . . it's done . . . so that he can maintain a relationship with his child. But right now, he's perilously close to losing that relationship. [¶] And I will

14

tell you that the reason that the court made the finding today . . . is because without a restraining order, I don't see that the circumstances wouldn't exist."

The court minutes for January 12, 2015 include a finding that, pursuant to section 364(c), "conditions still exist which would justify initial assumption of jurisdiction under sec[tion] 300 . . . , or those conditions are likely to exist if supervision is withdrawn." The minutes include the orders announced on the record that Father not contact Mother directly or indirectly, that Father schedule visitation directly with the social worker, that Father is not to attempt to discover the location of D.B.'s home or school or Mother's place of employment, and that Father must contact the social worker if he inadvertently learns any of that information.

Mother timely filed a notice of appeal from the juvenile court's January 12, 2015 order to continue dependency jurisdiction.

## III. DISCUSSION

Section 364(c) provides, in pertinent part: "After hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary. The court *shall terminate its jurisdiction* unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (Italics added.) Although the decision whether to terminate is considered discretionary (*In re Gabriel L.*, *supra*, 172 Cal.App.4th at p. 652), use of the word "shall" denotes a mandatory act (*Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, 542).

At the section 364 review hearing, SSA did not establish by a preponderance of the evidence that the conditions still existed that justified initial

15

assumption of jurisdiction.[3] Quite the contrary, SSA took the position and proved those conditions no longer existed and requested the juvenile court to terminate jurisdiction. The juvenile court initially found as much, stating, "the court believes that the conditions no longer exist and the court finds that the conditions are not likely to exist which caused the court to assume its initial jurisdiction in this matter." The juvenile court qualified this finding as requiring a restraining order against Father, and the court gave him the option of objecting to the restraining order. That was error. Having found the conditions justifying assumption of jurisdiction no longer existed, the court had to terminate jurisdiction and had no discretion to do otherwise. As the juvenile court recognized, it had the power to issue a protective order upon termination of dependency jurisdiction. (§ 213.5.)

After Father objected to a restraining order, the juvenile court found that the conditions justifying initial assumption of jurisdiction under section 300 still existed. Findings under section 364 are reviewed for substantial evidence. (*In re N. S.* (2002) 97 Cal.App.4th 167, 172.)

Substantial evidence did not support the juvenile court's finding. The Petition and the Supplemental Petition asserted dependency jurisdiction based on allegations of neglect. The 12/8/14 Report showed that as of late 2014, Mother had a residence in San Bernardino County and D.B. had her own bedroom and bathroom.

---

[3] The Court of Appeal in *In re J.F.* (2014) 228 Cal.App.4th 202, 210, concluded that "[t]he language of section 364 does not literally require that the precise conditions for assuming jurisdiction under section 300 in the first place still exist—rather that conditions exist that '*would* justify initial assumption of jurisdiction.'" However, section 364(c) refers to "*the* conditions" justifying "initial assumption of jurisdiction under Section 300" (italics added), not simply "conditions" or "any conditions." Thus, we believe the better interpretation of section 364(c) is that the court must terminate jurisdiction if the conditions that justified taking jurisdiction in the first place no longer exist. (See *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451.) We do not resolve the issue because the juvenile court should have terminated dependency jurisdiction under either interpretation.

Mother was healthy, was employed full time, had reliable transportation, and was attending conjoint therapy with D.B. Mother had graduated from her substance abuse program, had no positive drug and alcohol tests for the period reported by the 12/8/14 Report, and continued regularly to attend 12-step meetings. Mother's compliance and progress with her case plan were described as substantial. Mathy testified that Mother had completed her case plan and needed no additional services to keep D.B. safe. Father had stable employment and housing. Although Mathy was concerned about the overall quality of Father's visits with D.B., visits were appropriate, and Father did nothing during them that would justify assumption of dependency jurisdiction.

The 12/8/14 Report and the 1/7/15 Addendum Report recommended that dependent child proceedings be terminated with exit orders. SSA's recommendation is not controlling (*In re J.F.*, *supra*, 228 Cal.App.4th at p. 210); however, SSA's recommendation to terminate dependency jurisdiction is a strong indication that SSA did not attempt to prove, and did not prove, that the conditions which justified initial assumption of jurisdiction still existed.

Between the juvenile court's initial finding that the conditions justifying assumption of dependency jurisdiction no longer existed and the court's finding that those conditions still existed, nothing had happened except that Father objected to a restraining order. The juvenile court was justifiably concerned about Father's threats against Mother and also believed that continuing dependency jurisdiction was the best way to ensure that Father would develop and maintain a relationship with D.B. But SSA proved that the conditions which justified initial assumption of jurisdiction no longer existed. The juvenile court was therefore required by section 364(c) to terminate jurisdiction. Although the juvenile court had good intentions, it had no authority to keep the case open and subject Mother and D.B. to continued dependency jurisdiction.

The juvenile court has the ability to issue protective orders under section 213.5 and visitation orders. (§ 362.4.) Protective orders may be issued if

necessary to shield D.B. from harassment (§ 213.5) or to protect her from conduct that is "troubling, disturbing, vexing, and unwarrantably meddlesome" (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512).  On remand, the juvenile court may consider appropriate protective orders and visitations orders.  We express no opinion on whether the court should issue such orders or what their scope should be.

## IV.  DISPOSITION

The order under section 364(c) is reversed and the matter is remanded with directions to enter an order terminating dependency jurisdiction and to consider appropriate orders under sections 213.5 and 362.4.

FYBEL, J.

WE CONCUR:

O'LEARY, P. J.

RYLAARSDAM, J.

18

Filed 8/26/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law.<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>N.B.,<br><br>    Defendant and Appellant;<br><br>A.K.,<br><br>    Defendant and Respondent. | G051319<br><br>(Super. Ct. No. DP023353)<br><br>ORDER MODIFYING OPINION AND GRANTING REQUEST FOR PUBLICATION; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on August 6, 2015, be modified as follows:

1. On page 15, after the third full paragraph beginning "Section 364(c) provides," add the following new paragraph:

> The Court of Appeal in *In re J.F.* (2014) 228 Cal.App.4th
> 202, 210, concluded that "[t]he language of section 364 does not
> literally require that the precise conditions for assuming

jurisdiction under section 300 in the first place still exist—rather that conditions exist that '*would* justify initial assumption of jurisdiction.'"  Section 364(c) does not simply refer to "conditions" or "any conditions" but states the court shall terminate jurisdiction unless the social worker proves that "*the* conditions *still exist* which would justify *initial* assumption of jurisdiction under Section 300."  (Italics added.)  By using the phrase "the conditions still exist," the Legislature meant the conditions existing at the time of initial assumption of jurisdiction continued to exist at the time of the hearing, not that new conditions have arisen.  Thus, we believe, the better interpretation of section 364(c) is that the court must terminate jurisdiction if the conditions that justified taking jurisdiction in the first place no longer exist.  (See *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451.)  We do not resolve the issue because the juvenile court should have terminated dependency jurisdiction under either interpretation.

    2.  On page 16, delete footnote 3 in its entirety.

    3.  On page 17, in the first full paragraph beginning "The 12/8/14 Report," delete the second sentence beginning "SSA's recommendation" and replace it with the following two new sentences:

SSA's recommendation is not controlling (*In re J.F.*, *supra*, 228 Cal.App.4th at p. 210) and SSA has no veto power over the juvenile court's decision under section 364(c).  SSA's recommendation to terminate dependency jurisdiction is, however, a strong indication that SSA did not attempt to prove,

2

and did not prove, that the conditions which justified initial assumption of jurisdiction still existed.

4.  On page 17, in the second full paragraph beginning "Between the juvenile court's initial," delete the first sentence and replace it with the following new sentence:

> Between the time of the juvenile court's initial finding that the conditions justifying assumption of dependency jurisdiction no longer existed and the time of the court's finding that those conditions still existed, nothing had happened except that Father had objected to a restraining order.

These modifications do not effect a change in the judgment.

Appellant has requested that our opinion, filed August 6, 2015, be certified for publication.  It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c).  The request is GRANTED.  The opinion is ordered published in the Official Reports.


                                        FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.


3