Filed 4/21/25  In re Mason M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MASON M., a Person Coming Under the Juvenile Court Law. | B335671 (Los Angeles County Super. Ct. No. 23CCJP01443A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>V.C.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Stephen C. Marpet, Judge Pro Tempore.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, V.C. (mother) challenges the juvenile court's order continuing its jurisdiction over her minor son, Mason M. (son). Mother argues the court erred when it denied her request to terminate its jurisdiction at a March 2024 review hearing. Mother claims substantial evidence did not support the court's order to keep the case open. We find no error and affirm.

## BACKGROUND

### 1. The Family and Previous Referrals

Mother and A.M. (father) are the parents of son. Although mother and father lived together for approximately one year, they are no longer in a relationship and father has had little contact with son. Father is not a party to this appeal.

Prior to the underlying proceedings, the family had been the subject of three earlier referrals to the Los Angeles County Department of Children and Family Services (Department). In 2017, soon after son was born, the Department filed a Welfare and Institutions Code section 300 petition on behalf of son alleging son was at risk due to mother and father's domestic violence and father's substance abuse.[1] Those proceedings

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

resulted in a January 2018 custody order granting mother sole legal and physical custody of son.

In September 2022, a referral was made alleging mother behaved strangely, as if she was using drugs or had a mental health issue, and hit and pushed son. Again, in late January 2023, a referral was made claiming mother physically abused son. The Department closed both of those referrals as inconclusive.

## 2. Events Preceding Petition

In early April 2023, two months after the latest referral, the Department received a new referral alleging mother was physically and verbally abusive toward son during a telehealth session. The Department opened an investigation.

A Department social worker spoke with mother. Mother insisted that son always be in her view, even when he was in another room. Throughout the interview, mother tapped her legs, looked back and forth to son and the social worker. Mother told the social worker she disciplined son with warnings and time outs. She said sometimes, but not often, she spanked him with her hand on his buttocks. Any scratches were accidental. Mother reported she was "super overprotective" of son and, although she believed staff at his school was supportive, she feared for son's safety and admitted having a hard time leaving him at school. Mother stated she was not perfect and was "strict" with son because she wanted him "to be a good child."

Mother stated she took medication both "for [posttraumatic stress syndrome (PTSD)] due to her past relationship with . . . father in which she was a victim of domestic violence" as well as "for her thyroid." She said she also had attention deficiency but it was not clear if she took medication for that. Mother said she

3

had never done drugs and did not drink alcohol.  At first, mother said she was willing to drug test because she had nothing to hide, but later declined to drug test because she did not want to expose son to more strangers and "that type of environment."  Mother reported she had been in therapy but was "taking a break."  During an interview one week later, mother stated she had an upcoming therapy session.

Mother believed her family was unsupportive, was mean to her, and had "unstable behavior."  She said father's family also was not supportive.  She noted her grandmother, son's great grandmother (great grandmother), lived in the "front house" on the same property as her.  Mother said great grandmother was aggressive toward her and did not respect her privacy.  Mother stated she had no friends and no social life.  She focused "solely on caring for [son]."  According to mother, her "only free time" was when son was at school.

During her interview, mother became upset with the social worker.  Mother believed the social worker "was smirking," "was on drugs and was a bad person."  After the social worker apologized for offending mother and stated she was on mother's team, mother again became extremely nice and complimented the social worker.

Mother told the social worker she had married a few months earlier in December 2022.  Mother said she was not living with her husband due to financial reasons, did not see him often, and initially refused to provide any information about him.  Eventually, however, mother provided her husband's name and phone number.

The social worker tried to interview son the same day she interviewed mother, but son refused to speak.  One week later, a social worker again unsuccessfully tried to interview son.

The Department social worker spoke with father, who had not seen son for about five months.  Father said he had no contact with mother or son.  Father told the social worker mother behaved strangely, seemed paranoid, and was overprotective of son.  Father was not able to care for son at the time.

The social worker also spoke with great grandmother, who lived in a separate house on the same property as mother and son.  Great grandmother was angry with the Department for not having taken steps to help son earlier.  She believed "something dramatic needed to happen such as the child dying in order for [the Department] to do something."  She heard son crying all the time and had seen scratches and bruises on his body.  She said mother had no patience and threatened son "not to say anything."  Great grandmother told the social worker mother did not allow son to play outside and sometimes "gets in her moods."  Great grandmother believed mother used drugs and might be bipolar.  One week later, great grandmother told a Department social worker mother and son had not left the house for a few days.  She was worried for son and believed mother was "unwell."

Maternal grandmother also spoke with the social worker.  Maternal grandmother believed mother had mental health issues.  Maternal grandmother stated mother was "special," "easily offended," "gets mad fast," and was "unable to hold a job."  She said mother was not close to her family and did not want their help.  Maternal grandmother also believed mother used to, and perhaps still did, take drugs, which caused her to hallucinate.  Maternal grandmother said mother had "a very

5

strong influence on" son, was protective of him, and coached him on what to say. Maternal grandmother was worried about mother and son, said she would "always be there to support" mother, and was willing to care for son.

The social worker also spoke with a paternal aunt. Paternal aunt believed son had "a weird attachment to" mother and said mother "always talks over" son and "does not allow the child to speak his mind." Paternal aunt told the social worker mother "goes through phases where she hates everyone and disappears." Paternal aunt said "the family" thought mother was on drugs and was mentally unstable. Paternal aunt believed mother loved son, treated him like a baby, verbally abused him, and possibly told him what to say and do. According to paternal aunt, mother did not allow son to interact with anyone unless she was present. Paternal aunt did not spend time alone with son because she feared mother would accuse her of harming him. Paternal aunt stated mother's family was very supportive and wanted to help mother.

A Department social worker spoke with the principal of son's elementary school. The principal reported son was well behaved at school. The principal was concerned about mother. The principal stated mother came to the school "on a daily basis and insists on going to the classroom to drop off [son's] lunch, and cupcakes, even when there is no special occasion." The principal had to alert school staff not to allow mother on campus. The principal told the social worker mother talked over son when he tried to speak and mother did "all the talking." On one occasion, mother parked in a crosswalk near school, parents complained, and police were called. The responding officer told the principal

he believed "something is off with [mother]." The principal was "glad" the Department was involved with the family.

The school attendance counselor told the Department social worker that son had attended the school for 101 days and was absent for 58 of those days. She noted, "[W]hen [son] is out, he is out for weeks." She also stated mother called and messaged teachers "constantly" to ask if son is okay and if he needs anything.

### 3. Petition

In April 2023, the Department filed a three-count section 300 petition on behalf of son, who was six years old at the time (petition). Counts a-1 and b-1 both alleged mother physically abused son and threatened to physically abuse him. Count b-2 alleged son was at risk of harm due to mother's history of mental and emotional issues, including PTSD, paranoia, and hallucinations.

At the initial hearing on the petition held in May 2023, the juvenile court detained son from father and ordered son placed with mother under Department supervision. The court ordered, among other things, unannounced home visits, random drug testing for mother, and individual counseling. The court directed mother to make son available for interviews with Department social workers, without mother being present.

### 4. Continued Investigation

In June 2023, a Department social worker spoke with the speech pathologist who had conducted the telehealth session that resulted in the instant referral to the Department. The speech pathologist recalled son refused to participate in the session. Mother became angry and said to son, " 'Come over here or I am going to punch you. Get the Fuck over here now.' " Son began to

cry. The speech pathologist said son and mother were sitting on a bed when mother put her hand over son's face and pushed him backward onto the bed, causing son to cry louder. At another point, mother had her arm behind son, when son spontaneously said, " 'ouch' " and cried even more. The speech pathologist then heard mother say, " 'That is what you get when you don't cooperate.' " Son was inconsolable and the speech pathologist ended the session. The speech pathologist reported son "had a delayed language pattern, was sometimes reluctant to engage, and only communicated through the use of a few words."

A Department social worker also interviewed mother and son at their home. As the social worker arrived for the interview, he heard mother and great grandmother arguing loudly about mother's mail, which mother accused great grandmother of stealing. Great grandmother denied taking mother's mail. She said mother had lost multiple keys to the mailbox.

During mother's interview with the social worker, mother stated son sometimes was "aggressive, defiant, and disrespectful" and occasionally threw objects and had outbursts. Although son mostly appeared comfortable, happy, and loving toward mother, at one point he pushed mother aggressively. While the social worker was inside the home with both mother and son, the social worker attempted to engage with son, but son refused. Eventually, the social worker encouraged son to color outside. Once son was outside and alone with the social worker, son spoke with the social worker, albeit reluctantly. When asked about "sad moments" with mother, son told the social worker mother " 'hits me when I don't listen. She yells at me' " and " 'I cry.' "

In a virtual interview with mother a couple of weeks later, mother "adamantly denied" physically abusing or mistreating

son.  Regarding the telehealth incident that resulted in the referral to the Department, mother stated she proactively had scheduled speech therapy for son.  She said, on that day, son was not behaving or listening to her and she may have pulled his shirt to get him to listen and participate.  She did not remember shoving son or placing her hand on his face.  She said she did not intentionally harm son.  She remembered son was crying during the incident, but she told the social worker son often cried when he did not want to do something.  Mother also stated there may have been times when she pulled son into her car "because unknown persons were walking on the street or there was traffic speeding by."  Mother noted when son was defiant, disrespectful, or pushing boundaries, she spanked him as a form of discipline.  She did not do that often.  She believed the allegations in the petition were false and Department intervention was intrusive and unnecessary.

She told the social worker "part of her issues were related to the trauma and violence that she had suffered from the father," which caused her PTSD.  She said she was being treated for PTSD and social anxiety and had been diagnosed with ADHD.  She took medications as prescribed.[2]  Mother believed great grandmother and maternal grandmother were "dismissive" of her and "meddled" in her "personal affairs and parenting."  She said her family was at times " 'toxic' " and criticized her.

The social worker also spoke with great grandmother and maternal grandmother separately.  Both reiterated they loved mother and son, wanted the best for them, and were willing and able to help.  Both noted mother was distrustful and never left

_____

[2] It appears one of mother's medications resulted in a June 2023 positive drug test (positive for amphetamines).

son alone or with other people.  Maternal grandmother said mother became agitated and verbally aggressive if anyone tried to talk to son apart from mother.  Great grandmother similarly reported mother did not allow anyone to talk to or question son.  It seemed to great grandmother that mother coached or controlled son.  Maternal grandmother noted son appeared "uncertain around his mother" and often looked to "mother prior to responding to the maternal relatives."  Maternal grandmother limited her contact with mother because mother was angry with and resentful toward maternal grandmother and blamed maternal grandmother for her problems.  Maternal grandmother described some of mother's bizarre behaviors, including leaving home with son for days and not answering her phone, calling to say she had bugs on her arm, and needing a ride home in the middle of the night after becoming "stranded" with son away from home.  Great grandmother said mother was "astute" and "able to convince others that she was fine."

Before the Department's involvement, both great grandmother and maternal grandmother had seen marks on son's face.  Great grandmother believed mother was responsible.  Great grandmother also recalled a time son was crying while walking to school and he seemed to indicate mother had hit him.  Maternal grandmother believed mother loved son but also believed "something [was] wrong with the mother and the mother needs assistance to help safely care for her child."

The social worker spoke with a maternal great aunt, who echoed the concerns voiced by maternal grandmother and great grandmother.

The social worker also spoke with paternal aunt.  Paternal aunt reported mother rarely allowed visits with son and when

she did, mother was always present.  Paternal aunt stated during one visit mother told son to tell mother that he loved her and, if he did not, mother would leave him.  Son began to cry.  Mother then told son he had to tell mother he only wanted to be with mother.  Paternal aunt said mother sometimes called for help with bizarre situations.  One time mother called paternal aunt and said she "felt like she had worms coming out of her mouth." Another time, mother asked paternal aunt to pick up mother and son from an industrial building on the side of a freeway. Paternal aunt never saw marks on son, but she was concerned for him because of mother's behaviors.

Finally, the social worker spoke with two of mother's friends, neither of whom had any concerns about mother or son. The social worker called mother's husband, but he could not fully understand English and required an interpreter.

In July 2023, the Department reported mother had enrolled in a parenting program, attended one session, and did not return. Mother also had signed up for individual therapy, but had rescheduled her first appointment several times and, by mid-July 2023, had not met with her therapist.  During an unannounced home visit, a Department social worker found mother's home to be "messy and cluttered."  The social worker asked about son's summer school, to which mother replied son had not been attending because he had a cough and was not feeling well.  Each time mother mentioned the cough, son immediately coughed. Mother also indicated she had stopped taking her anxiety medication but was planning to refill her prescription.

The Department believed son was at risk of abuse and neglect "due to the mother's likely physical abuse of [son] and the mother's behaviors possibly associated with a mental health

disorder." The Department reported, "[I]t appears probable and likely that [son] has lived in a periodically volatile, and neglectful environment while with his mother" and "the incidents of the mother's inability to handle stressful situations or manage [son's] behaviors without resorting to a physical reactions [*sic*] do not appear to be isolated or an aberration." The Department further believed mother's mental health issues could be "contributory factors in [her] behaviors and responses to stressful situations." The Department was concerned that mother seemed to isolate herself and son, was not consistently taking her prescribed medication, and potentially suffered from an undiagnosed or untreated mental health condition, all of which could impact her ability to parent son and handle his own challenging behaviors.

The day before the adjudication hearing, mother called the Department social worker to note her disagreement with the Department's recommendations. Mother believed her rights were being violated and she was being discriminated against. She requested a new social worker be assigned to the case and the case be closed.

### 5. Adjudication and Disposition

A combined jurisdiction and disposition hearing was held in July 2023. At the hearing, mother pleaded no contest to the petition as amended. The juvenile court sustained the b-1 count, which concerned mother's physical abuse of son. The court dismissed the identically worded a-1 count and the b-2 count concerning mother's alleged history of mental and emotional problems.

The court declared son a dependent of the court under subdivision (b) of section 300 and ordered him to remain released to mother under Department supervision. The court ordered

mother to submit to eight random and on demand drug tests as well as to a psychological assessment and psychiatric evaluation. The court also ordered mother to participate in parenting classes, individual counseling, and conjoint counseling with son if recommended by son's therapist, and to take all her prescribed medications. The juvenile court also ordered that son participate in individual counseling and "all age-appropriate services."

**6.     Review Period**

In October 2023, three months after disposition, the Department reported son had one individual counseling session. Son's therapist stated that, at son's request, mother was present for son's session. The therapist stated mother "distracted and influenced [son] during the session" and made "it difficult for [son] to concentrate and speak freely." According to the therapist, "[T]here was a notable attachment issue with" mother. The therapist said son could not express himself verbally but did so through play therapy. Son was "aggressive and rough in his play." Mother told the therapist she was married but had not seen her husband since the beginning of the year. She said her husband and son did not get along. Mother said she was " 'not sure if he [husband] touched him or something happened' " and said one time son "asked her to take off her clothes."

The Department also reported son was doing well at school, but mother's behavior continued to raise concerns and son continued to miss a lot of school time.

In October 2023, the Department also reported on mother's court-ordered services. Mother's individual therapist reported mother was doing well in therapy. The therapist had no concerns for mother at the time. Mother also had been participating in parenting classes. Her parenting instructor, who also met with

13

mother individually on a weekly basis, stated mother had two classes left and had been doing well in the program. Mother's psychiatrist was treating mother for ADHD and PTSD. Mother said she was taking her prescribed medications. Mother had tested negative for drugs four times and was a "No Show" for her most recent drug test. A family preservation worker reported mother participated in weekly sessions at mother's home, but son refused to participate and often screamed and cried when the family preservation worker arrived. The family preservation worker believed son needed to learn more independence.

Although by October 2023, mother was in compliance with most of her court orders, the Department social worker assigned to the family remained concerned. The social worker had mostly been unable to interview son separate from mother. On one occasion, the social worker spoke with son at school, where he spoke openly and engaged in conversation. The social worker tried again to interview son at school, but mother denied access to son and said she did not agree with the social worker speaking with him at school. Any time the social worker tried to speak with son at his home, he would not allow mother to leave the area and would not answer questions or speak freely.

At an October 2023 hearing, the court ordered son to continue his counseling sessions "by himself" and mother to allow son to be interviewed "by himself when it's arranged." The court explained to mother the importance that son be allowed to attend therapy sessions as well as interviews on his own, without her present. Mother indicated she understood.

In a January 2024 status report, the Department reported son was bonded with mother but there appeared "to be a boundary issue with both," son struggled "to detach from

14

[mother]," and son had "some aggressive behaviors." The Department noted son only struggled with these behaviors when he was under mother's supervision. The Department suspected mother was coaching son. Son was doing well in school, although he had experienced some bullying and continued to have attendance issues. Son stated "he feels good and bad with [mother] but did not know how to describe his feelings." According to the Department, son was "reluctant to share his true feelings unless he is in a completely private environment free from [mother's] influence."

The Department also reported that although in late October 2023, son began attending counseling sessions individually, issues remained regarding son's attendance and mother's disruptive behaviors. Son's therapist, Ms. Nevarez, reported son struggled with aggression toward mother and doing things independently. In November 2023, mother canceled an appointment with Ms. Nevarez at the last minute and requested a new therapist. Mother believed "Ms. Nevarez was too intimidating for [son] based on eyes and height." Ms. Nevarez had not noticed son to be uncomfortable during sessions. Mother was informed she could not change son's therapist "on a whim" and Ms. Nevarez remained his therapist. Ms. Nevarez told a Department social worker son came to one session 30 minutes late and with a cell phone. Mother and son called each other during the session. Mother asked son if he needed water, if he was okay, and how much time was left for his therapy session. Ms. Nevarez wondered if the phone was intended for recording the session. Another time, mother wanted son to enter a session with a backpack and a phone. Ms. Nevarez refused to allow the backpack and son refused the phone. At some point, mother

15

again asked for a different therapist for son. Mother told Ms. Nevarez she did not plan to continue therapy once the dependency case closed. Ms. Nevarez told mother she needed to continue therapy.

In its January 2024 report, the Department stated mother had completed her parenting classes and her individual therapy goals. Neither her therapist nor parenting class facilitator had any concerns. Mother reported she was taking her medications as prescribed. Nonetheless, the Department continued to work with mother on parenting skills, in particular teaching son independence and creating boundaries. The Department was concerned with mother and son's relationship and son's potential underlying behavioral issues. Although mother "care[d] deeply" for son, the Department believed mother lacked boundaries with son, had "an unhealthy attachment" to him, and had been a "barrier" to son receiving therapy services. Mother continued to request a new therapist for son and wanted family therapy over individual therapy. The Department worried mother would end son's therapy if it was not court ordered. In its report, the Department noted, "The Department suspects that mother tries to change the child's therapist constantly because she is possibly concerned of what the child will disclose. The Department sees this as a red flag for the child's safety. The child already appears coached not to say much and now that he is gaining rapport with his therapist, mother wants to change it and has stated that once the case closes she will not keep the child in therapy."

Son reported he loved mother but at times she disciplined him by hitting or pinching him when she was upset. However, son did not indicate mother had done that recently. A Department social worker reported son was physically aggressive

16

with mother, noting he hit and pushed her when he was upset. Mother told the social worker she no longer used corporal punishment to discipline son but instead used time outs.

In January 2024, the juvenile court ordered mother not to participate or intervene in son's therapy sessions and not to record or photograph those sessions. That same month, the Department received a referral alleging mother sexually abused son. The Department investigated and found those allegations unfounded.

In February 2024, the Department reported that, at mother's request, son had been assigned to a new therapist, Ms. Rodriguez. Mother then said she wanted son to return to Ms. Nevarez. Eventually, son began individual counseling with Ms. Rodriguez. By early March 2024, son had seen Ms. Rodriguez five times and was doing well with her. Ms. Rodriguez had concerns and believed son would benefit from continued therapy. She reported mother had not tried to intervene in son's sessions.

The Department recommended that court-ordered services continue for an additional three months.

## 7.    Review Hearing

On March 6, 2024, the juvenile court held a section 364 review hearing. At the hearing, counsel for mother asked the juvenile court to terminate jurisdiction and grant mother sole legal and physical custody of son. Counsel noted mother had completed her services and the issue on which the court based jurisdiction—improper discipline of son—no longer existed. Counsel argued mother had gained the necessary insight.

Counsel for son, on the other hand, urged the court to keep the case open. Counsel noted son's therapy had begun with mother attending his sessions, then mother sent son to sessions

17

with a phone and made requests for a new therapist.  Counsel further noted son only recently had begun individual sessions with a new therapist and without mother's interference.  Counsel wanted to be satisfied "the issues that brought the case to court have been resolved.  And I'm not confident that that is happening."

After hearing argument, the juvenile court found mother was in "partial compliance" with her services.  The court noted it was "a good thing" mother no longer was interfering with son's individual counseling.  The court continued its jurisdiction for three months and ordered son to remain consistent with counseling sessions and mother not to interfere with those sessions.

8.    **Appeal and Postappeal Events**

Mother appealed the court's March 6, 2024 order continuing its jurisdiction.

The following month, the Department filed both a subsequent petition and a supplemental petition on behalf of son, alleging mother physically abused son and failed to comply with juvenile court orders.  The juvenile court detained son from mother.  On June 5, 2024, the juvenile court sustained the subsequent and supplemental petitions, removed son from mother, and ordered family reunification services.  Mother did not appeal the juvenile court's June 5, 2024 findings and orders.

The Department filed a motion to dismiss the instant appeal.  In a January 24, 2025 order, we denied the Department's motion to dismiss.

## DISCUSSION

**1. Applicable Law and Standard of Review**

The parties agree the relevant statute is section 364, which applies to review hearings in the juvenile court when a child, such as son here, has not been removed from a parent. At a section 364 review hearing, the juvenile court "shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the [Department] establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).)[3] Section 364 also provides, "Failure of the parent or guardian to participate regularly in any court ordered treatment program shall constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary." (*Ibid.*)

"When proceeding under section 364, because the child is in placement with a parent, the court is not concerned with reunification, but with determining whether continued

---

[3] Courts are split on whether the phrase "conditions still exist which would justify initial assumption of jurisdiction" as used in section 364 refers to the same conditions that justified the juvenile court's initial exercise of jurisdiction in the case, or to any condition that would justify dependency jurisdiction at the time of the section 364 review hearing. (See *In re N.O.* (2019) 31 Cal.App.5th 899, 923; *In re D.B.* (2015) 239 Cal.App.4th 1073, 1085; *In re J.F.* (2014) 228 Cal.App.4th 202, 210.) We need not address this apparent split of authority, however, because as discussed below the juvenile court could have continued its jurisdiction under either interpretation of section 364.

supervision is necessary in the family home." (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650.) Section 364 " 'establishes a statutory presumption in favor of terminating jurisdiction and returning the children to the parents' care without further court supervision.' " (*In re N.O.*, *supra*, 31 Cal.App.5th at p. 923.) The juvenile court makes its section 364 determination "based on the totality of the evidence before it." (*Id.* at p. 922.)

We review the juvenile court's order under section 364 for substantial evidence. (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1156; *In re J.F.*, *supra*, 228 Cal.App.4th at p. 209.) "Under the substantial evidence standard of review, the appellate court does not reweigh the evidence, evaluate the credibility of witnesses, or draw inferences contrary to the findings of the trial court. [Citation.] The appellate court 'accept[s] the evidence most favorable to the order as true and discard[s] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.' [Citation.] For evidence to be sufficient to support a trial court's finding, it must be reasonable, credible, and of solid value." (*In re J.F.*, *supra*, 228 Cal.App.4th at p. 209.)

## 2.   Substantial evidence supports the juvenile court's order continuing jurisdiction.

Mother argues substantial evidence does not support the juvenile court's finding that, at the time of the section 364 review hearing, conditions still existed justifying jurisdiction. Mother asserts the conditions that prompted jurisdiction—mother's physical abuse of son—had been eliminated as there were no reports of such abuse following the adjudication and disposition hearing. Further, mother notes she had completed her court-ordered services. We disagree with mother's analysis.

Although by the time of the section 364 review hearing mother had completed her court-ordered services, she had only recently begun to cooperate in satisfying the court-ordered counseling for son.  The record includes ample evidence of both son's problematic behaviors and mother's frustration with those behaviors.  Indeed, toward the start of the underlying proceedings mother conceded she sometimes responded to son's behaviors with physical discipline.  Despite knowing son's behaviors were problematic, mother repeatedly impeded his court-ordered counseling.  At the time of the section 364 review hearing, son had been seeing his new therapist for only one month.  Moreover, mother had stated she would discontinue son's counseling when the dependency case ended, thus thwarting attempts to address son's behaviors.

Additionally, it is undisputed mother fostered an unhealthy relationship with son.  Although mother loves son, she exerted an unusual amount of control over him.  The record reveals that almost everyone who was involved below—social workers, relatives, school personnel, son's therapist—was concerned that mother not only was coaching son but also at times did not want him to speak to anyone outside of her presence for fear of what he might say.  For example, mother denied the Department access to son at school, where he was more forthcoming.  Similarly, when son finally began to form a relationship with his first therapist, mother switched him to a new therapist.  Mother's control over and coaching of son were concrete issues throughout the underlying proceedings.  It was clear son was not fully expressing himself. Without consistent counseling as ordered by the court, son's behaviors (which

21

prompted physical discipline from mother) and unhealthy attachment to mother had not fully been addressed.

Less than two months before the section 364 review hearing, the Department reported son said "he feels good and bad with [mother] but did not know how to describe his feelings."  Son continued to experience a level of discomfort with mother that had not been satisfactorily resolved or understood by the time of the section 364 hearing.  Given the record before us, we conclude substantial evidence supports the juvenile court's determination that the conditions initially justifying jurisdiction still existed or likely would exist if court supervision were withdrawn.

Finally, we are not persuaded by the cases on which mother relies because they are factually distinct.

## DISPOSITION

The juvenile court's March 6, 2024 order is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


RICHARDSON, J.

22