Filed 6/27/23  In re Jam.R. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Jam.R. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br><br>          v.<br><br>Jas.R.,<br><br>      Defendant and Appellant. | G062095<br><br>(Super. Ct. Nos. 22DP0863; 22DP0864)<br><br>O P I N I O N |

        Appeal from orders of the Superior Court of Orange County, Isabel Apkarian, Judge.  Affirmed in part, reversed in part, and remanded.

        Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsels, for Plaintiff and Respondent.

No appearance for the Minors.

\* \* \*

Then three-year-old twins Jam.R. and M.R. (together, the Children) became involved in these child welfare proceedings after a verbal altercation between their parents, Jas.R. (Mother) and R.R. (Father) became physical. The Children have remained in Mother's custody throughout these proceedings.

After a joint jurisdiction/disposition hearing, the juvenile court sustained the child welfare petition, removed the Children from Father's custody, ordered family maintenance services for Mother and enhancement services for Father, denied Mother's request for a restraining order, and denied the request of the Orange County Social Services Agency (the Agency) to terminate the child welfare proceedings. Mother appealed from the jurisdiction/disposition order. As explained in detail, *post*, we affirm in part, reverse in part, and remand.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

I.

FATHER'S FELONY CHILD ABUSE CONVICTION AND PREVIOUS CHILD WELFARE CASE

In March 2005, Father severely beat his then-girlfriend's two-year-old son; the child died sometime later as a result of his injuries. Father was convicted of felony child abuse.

As a result of Father's criminal actions, his own three-year-old son was declared a dependent of the court in April 2005. That child welfare case was dismissed with custody to the child's mother, but a new proceeding was initiated when that child's mother allowed Father to have unsupervised contact. The sustained petition in that

2

proceeding alleged Father caused the death of a child, had an unresolved history of substance abuse, had a history of violent behavior including assaults on his former girlfriend and her child, another former partner, and a police officer. Father was denied reunification services and his son was ultimately adopted out of the dependency system.

## II.

### THE INCIDENT LEADING TO THE PRESENT CHILD WELFARE CASES AND THE POLICE REPORT

Mother and Father began dating in 2016. They broke up and got back together several times but have been separated since 2019 or 2020. They are the parents of the Children, who are now four years old. The family court ordered that Mother have custody of the Children, with Father having visitation on weekends and some weekday afternoons.

On Saturday, June 25, 2022, Mother called the police. The police dispatcher "could over hear a verbal dispute in the background, as well as the sounds of children screaming and crying." A police officer responded to the home; Father had left before the police arrived. Mother was "extremely upset" and was crying. She had visible injuries on her face, said she had pain in her nose and teeth and numbness on the right side of her face. The Children were "hysterically crying" and the officer saw children's clothing thrown around in disarray. Mother told the officer when Father came to pick up the Children for visitation, she told him not to come inside because she had just gotten over COVID, but he entered anyway. Mother gave Father clothes for the Children. Father asked for a bag or backpack to put the clothes in, but Mother said he should have brought his own bag. Father became upset and he and Mother began to argue. Father raised his voice, shouted obscenities, and threw the Children's clothing across the living room.

3

Mother told Father he had anger management issues, after which he became more upset and took M.R. outside while yelling to Jam.R. to follow. Mother followed him outside to say goodbye to the Children. While Father held M.R. and Jam.R. looked on, Father pushed Mother away with his elbow into her torso. As Mother continued trying to say goodbye, Father pushed her into the wall, causing her to hit the back of her head. Father asked, "'Do you want me to hit you?'" and then hit Mother in the face two times with a closed fist. Mother "gouged" Father's eyes in self-defense. When Mother said she was calling the police, Father put M.R. down on the ground and left without the Children.

Although Mother was initially hesitant to obtain protection from Father, "due to his recent behavior, and anger issues she finds trust to be unpredictable. She is in fear that [Father] will return and hurt her or the kids." An emergency protective order was issued.

## III.
### THE DETENTION REPORT, THE WELFARE AND INSTITUTIONS CODE SECTION 300 PETITION,[1] AND THE DETENTION HEARING

A social worker visited Mother's home a few days later, and found the home to be "clean, properly furnished, and had adequate provisions for the children" with "no safety hazards." Mother denied any history of drug or alcohol abuse. Mother admitted being diagnosed with anxiety, depression, and PTSD in the past and disclosed she had been a victim of a kidnapping with sexual abuse when she was 12. She had received "'years of therapy'" and would reach out for mental health services whenever she needed them. She had also gone to therapy for help in dealing with postpartum

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

4

depression but had been told by her therapist she no longer needed therapy. Mother indicated that due to the domestic violence incident with Father, she would resume therapy.

After the incident, Mother requested an ex-parte order from the family court and was granted a temporary restraining order protecting herself and the Children.

Mother claimed she knew nothing about Father's previous child welfare case and felony child abuse conviction until after she moved in with him. She stayed with Father after she learned the truth, which she admitted "did not show the best judgment."

During their relationship, Father was "'up and down and unpredictable,'" and verbally and emotionally abused Mother. The family had to "'walk around on eggshells'" to avoid Father's temper. Mother did not want to get back together with Father but was willing to co-parent the Children with him. However, during a recent outing with the Children, Father got upset while he was driving and threw his cellphone toward Mother. He stopped for gas and "was hitting the gas pump and slamming items around," all of which caused the Children to be scared.

Several days after the incident, the social worker spoke to the Children. They were dressed appropriately, showed no signs of abuse or neglect, appeared physically and developmentally on track, and were energetic and ran around playing. Regarding the June 25 incident, M.R. told the social worker, "'daddy pushed mommy against the wall,'" and "'me, [Jam.R.], and mommy got hurt.'" She wanted Mother and Father to "'say sorry'" to each other. Jam.R. told the social worker Father "pushed him down the stairs." Mother noticed Jam.R. had more tantrums and had been hitting her and M.R. more since the incident, and M.R. was having bad dreams. Mother was attempting to obtain behavioral therapy for them.

The Children's then 14-year-old maternal half-sibling, K.R., was asleep upstairs on the day of the incident and did not witness it. K.R. denied any abuse, had no

knowledge of any substance abuse in the home, and denied seeing any domestic violence in the home.

The Children's adult maternal half-sibling, T.G., also lived in the home but was not present for the incident. T.G. reported that after the incident Mother was scared because this was the first time Father had been physically abusive toward her. When T.G. was a minor and Mother and Father were together, T.G. heard Father "screaming and yelling" at the Children. T.G. confronted Father and Father pushed T.G. "while he was holding [Jam.R.]."[2]

When Father was interviewed by the social worker, he denied any drug or alcohol abuse, mental health issues, or neglect or abuse of the Children. As to the June 25 incident, Father claimed Mother threw the Children's clothes at him while he waited outside. When he asked her for a bag they began arguing. Father claimed Mother started punching and kicking him while he held M.R., and M.R. screamed at Mother to stop. Father denied hitting Mother but said he tried to keep her away by extending his open palm. Father bumped into Jam.R. who "'stumbled down'" the steps. Father then left without the Children. When he tried to file a police report, the police "'basically laughed at him.'"

Father claimed Mother had "'multi-personality disorder,'" threatened to kill him before the Children were born, and gets "'out of hand'" and starts yelling. He denied ongoing domestic violence between them. Father refused to discuss the death of his former girlfriend's son, but admitted his biological son had been adopted by his maternal grandmother because Father was in prison and that child's mother was addicted to substances.

---

[2] It is unclear from the appellate record whether Father or T.G. was holding Jam.R. at the time.

About three weeks after the June 25 incident, the Agency filed a child welfare petition alleging the Children were within the juvenile court's jurisdiction pursuant to section 300, subdivisions (b)(1), (f), and (j).[3] At the initial detention hearing, the court detained the Children from Father, left them in Mother's custody and care, and ordered supervised visitation for Father. Mother requested and was granted a temporary restraining order against Father by the juvenile court.

## IV.
### THE AGENCY'S REPORTS BETWEEN DETENTION AND THE JURISDICTION/DISPOSITION HEARING

After the detention hearing, the Children remained in Mother's custody and care. During a visit, M.R. told the social worker she had seen when "'Daddy pushed mommy on the head on the wall'" and "'mommy had blood on nose.'" The Children were generally healthy and up-to-date on medical and dental examinations. They were engaged in "developmentally age-appropriate activities," including dance classes, summer camp, and swimming lessons. During monthly visits with the Children, the social worker regularly observed the Children were clean, appropriately dressed, and well cared for. Mother had enrolled the Children in weekly play therapy.

Mother participated in completing her case plan. She enrolled in a parenting class and participated in a parenting support group that met after her class, a personal empowerment program, and therapy. While waiting for her individual therapy

---

[3] As to section 300, subdivision (b)(1), the petition alleged a failure by the parents to protect the Children because of domestic violence, Father's anger management issues, substance use, severe physical abuse of an unrelated two-year-old child, criminal history, and Mother's history of mental health issues. As to subdivision (f) of section 300, the petition alleged severe physical abuse by Father causing the death of an unrelated two-year-old child and as to section 300, subdivision (j), the petition alleged the Children's paternal half-sibling had been abused or neglected by Father.

referral to go through, Mother got herself on a waitlist for individual counseling through her domestic violence program, and began counseling in September 2022. She planned to continue with therapy even after her involvement with the court and the Agency was over.

During the earliest stages of the child welfare proceedings, the Agency was precluded from scheduling visitation due to the protective order. Father called the Agency and demanded visitation; he would "scream" and hang up. Father was allowed to begin visiting the Children in September 2022. He told the Agency he was only available on the weekends due to school and work.

While the Children enjoyed seeing Father at visits, he had difficulty following visitation guidelines and acted in a threatening and aggressive manner towards staff. His "demeanor towards the monitor was hostile and rude" throughout a visit on September 10, 2022. When the social worker attempted to redirect one of the Children, Father angrily told her "'you are only here to supervise the visit.'" He threatened to spank M.R. if she did not put her shoes and socks on. At the end of the visit he told M.R., "'I need to go before I say mean/bad things.'"

Father "'was belligerent and would not let [a social worker] get in a word edgewise'" when the social worker called to schedule a visit. The social worker reported: "'With raised voice, he was threatening to go after me personally, speak to my supervisor, and make sure that I lost my job if I did not have his children at [the visitation center] at 9:30 a.m. He said that he hated me because I was a part of the Agency that was keeping him from getting his hours with his children. (He used more 'colorful' language than that.)'"

A visitation monitor described Father's behavior during a visit as: "'bullying, manipulation, inconsideration, haughtiness, rudeness, intimidation, argumentation and threats.'" A sheriff's deputy reported "father's behaviors [were] inappropriate for the center." A separate visitation monitor noted: "'He was angry,

disrespectful, defiant, telling the staff how to do their job, he tried intimidating the staff, he was making other families uncomfortable.'"

The social worker attempted to speak to Father about his behavior and inform him the visitation center would no longer accommodate his visits. Father became irritated and said, "'whoever is telling you that is bullshit.'" Father claimed the visitation center staff was treating him disrespectfully: "'If you come at me with attitude and being disrespectful so will I.'"

Mother told the social worker the Children were emotionally affected after visits, and she was concerned about Father's ability to control his anger during visits. M.R. had said, "'[Father] was rude to the man and women,'" "'daddy is sad or mad,'" and "'daddy will say don't touch my children.'" M.R. had also become protective of Father: "'I have to take care of my daddy.'" Jam.R. had exhibited more "aggressive behaviors" such as throwing tantrums when he did not want to share with his sister or follow the rules at home.

Based on the foregoing, the Agency filed an ex parte request on October 3, 2022, seeking authorization "to terminate any visit upon inappropriate conduct by Father" and ordering that "Father be required to visit at monitored locations with [a security officer] present." After a hearing on October 6, 2022, the court granted the ex parte request.

Initially, Father was not interested in discussing his case plan. Father denied fault, declined to participate in services, blamed Mother for everything, and repeatedly told the social worker, "'don't tell me what to do.'" On another occasion Father said he was uninterested in services and only interested in visitation. He used profanity, spoke in a loud tone of voice, and stated "he was mad about the situation."

9

Between detention and the jurisdiction/disposition hearing, Father only participated in one 12-hour online parenting class.[4] Father showed up for a single random drug test, which was positive for cannabis and THC. The social worker noted Father was not entitled to reunification services because the Children were in Mother's custody, he had caused the death of another child through abuse or neglect (§ 361.5, subd. (b)(4)), and he had had his parental rights terminated over a half-sibling and had not resolved the issues leading to that child welfare proceeding (§ 361.5, subd. (b)(11)).

V.

THE JURISDICTION/DISPOSITION HEARING

A combined jurisdiction and disposition hearing was held in November 2022.[5] The Agency recommended the juvenile court sustain the petition, declare dependency, terminate jurisdiction with exit orders, and grant sole custody of the Children to Mother. The juvenile court admitted into evidence all of the Agency's reports,[6] and heard testimony from Father, Mother, and the social worker.

---

[4] The Agency had recommended the following services as part of Father's case plan: Batterer's Intervention Program, Child Abusers Treatment Program, individual counseling, parenting classes, 12-step program meetings, outpatient substance use treatment program, and random drug testing.

[5] The hearing was continued multiple times. Some of the delays were caused by two separate attorneys declaring a conflict and asking to be relieved from representing Father. The temporary restraining order against Father was reissued at every continuance so the propriety of a permanent restraining order could be heard with the issues of jurisdiction and disposition.

[6] These were the jurisdiction/disposition report dated August 16, 2022, addendum report dated September 1, 2022, ex parte request dated September 26, 2022, addendum report dated October 13, 2022, addendum report dated October 25, 2022, addendum report dated November 28, 2022, and addendum report dated November 29, 2022.

10

A. *Father's testimony*

Father testified he was picking up the Children on June 25, 2022, because it was his weekend based on the court-ordered custodial arrangement with Mother. Mother had told him she was sick. Mother did not give him permission to enter; Father denied pushing his way in. Jam.R. came out and gave Father a hug; M.R. played hide and seek with him from inside, then came out and also gave him a hug. Father asked for clothes for the Children and Mother gave him the clothes but would not give him a bag to put them in. Father threw the clothes back into the house, grabbed M.R., and walked out. He told Mother, "'Since you won't give me a bag, I will go buy them clothes.'"

The fight began when Mother attacked Father "with her fists and her legs, her feet." Father was holding M.R. and tried to push Mother away with the palm of his hand. Father then fell down the stairs and knocked down Jam.R. Mother picked up Jam.R., "ripped" M.R. out of Father's arms, and told him to leave.

Father denied injuring Mother. "For me, for someone my size to cause injuries, I would have to be hitting [them] pretty hard. I was pushing her away with the palm of my hand (gesturing)." Father explained that his hands are two times the size of most people's and if he hit Mother she would have suffered much more damage, as he was stronger than Mother and would "crush" her. Father testified: "I'm scared to death of hitting people with these (gesturing) [be]cause what they can do. I won't use this on even a woman, let alone children, like y'all think I'm doing."

Father called the Huntington Beach Police Department after the incident and told them it was his custodial weekend; "[t]hey said there's nothing we can do about it." The police laughed at him when he said Mother assaulted him. Father understood that a temporary restraining order was issued because "she stated I hit on her." A permanent restraining order had not been issued; the next court date in the family court was December 22, 2022.

11

Father admitted he went to prison from May 2007 to June 2015 on charges of felony child abuse in connection with the death of his former girlfriend's son. He was then on parole for 13 to 16 months and had no parole violations. He attended an anger management class in 2015 as part of his parole and had taken a second anger management course subsequently. He did not believe he currently had an anger management issue and testified, "I might get angry once in a while, but nothing where it's gonna get out of hand obsessive."

He planned to attend another anger management program as required by his case plan, but had yet to do so. He had not participated in a child abuser's program or batterer's intervention program. He had completed one parenting class and was currently attending another. Father denied having a drinking or drug problem and had not participated in a 12-step program. He saw no reason to participate in drug testing or counseling.

Father denied yelling or making any threats to anyone during visitation with the Children. Father admitted making comments about the social workers' lack of effort in providing visitation, but denied doing so in front of the Children.

Father believed he has a "really good" relationship with the Children when he gets to see them. He disciplines them by talking to them or placing them in timeout.

B. *Mother's testimony*

Mother testified Father was emotionally and psychologically abusive to her and the Children. When Mother and Father lived together there was "[j]ust a lot of yelling at myself, my children, gaslighting, arguing all the time, controlling." If she and the Children failed to do what Father wanted, "there was constant yelling, arguing." Father raised his voice "[a]ll the time." Mother felt "[d]emeaned, controlled, trapped." Father also had a substance use problem and smoked excessive amounts of marijuana.

When Father came to pick up the Children on June 25, Jam.R. ran up to Father and M.R. played hide and seek. Mother told the Children she was sick so Father

12

could not come in.  M.R. ran out and hugged Father.  Mother handed the Children's clothes to Father and turned to get their sippy cups.  Father said, "'No bag?'"  Mother told him he already had a backpack.  When Mother turned around again to get the sippy cups, Father threw the clothes at her back.  Father yelled, "'F' it.  I'll get my own damn . . . clothes."  Mother said, "'[y]ou have some serious anger management issues'" and asked him to stop making a scene on her patio.  Father became "irate" and said:  "'I don't have any F-ing anger management issues.  You have an F-ing attitude.'"  Father told M.R., "'Come on, [M.R.].  Mommy has an F-ing attitude.  Let's go.'"  Mother stepped forward to give the Children their sippy cups and say goodbye.  Mother kissed them and said,  "'Bye.  I love you.  Have a good day.  Be good for Daddy.  Listen to Daddy.'"  Father turned around and said, "'Get the fuck away from my children.  If I can't come in your house, then you can't . . . then get the fuck away from my children.'"  Father asked Mother, "'Do you want me to hit you?'"  He then hit her twice with a closed fist, once on the side of her nose and once on her right cheekbone.

Father pushed Mother repeatedly against the wall, saying, "'Get the fuck away from me.  Get the fuck away from my children.'"  At some point, Father bumped into Jam.R., who was on the stairs, and Jam.R. lost his balance and fell down the stairs.  The Children were scared and crying during the incident.  Neither understood what was going on.

After the incident, Mother's nose was bleeding, she had a cut on the side of her nose, and she was bruised on her cheekbone.  The back of her head hurt from being pushed against the wall repeatedly.  She called the police once she got inside with the Children.  She refused medical assistance because she "was more concerned about [Jam.R.]."

Mother was in agreement with the provision of monitored visitation for Father but was concerned about his anger management issues and instability.  Mother was concerned that he had "been acting severely out of character" by, for example,

13

hitting her in front of the Children.  Father was constantly having temper tantrums and the Children copied this behavior.  The Children would be "emotionally molested from his emotional instability" after visits.  Mother was also concerned Father had recently lost "an extreme amount of weight" and refused any drug tests.  She was afraid Father's proposed monitors would not adequately supervise the visitation.  Mother had seen Father intimidate others.  Mother wanted Father to have a relationship with the Children "as long as it's safe."

Mother continued to request a restraining order, as she was afraid of Father.

C. *Social worker's testimony*

The social worker testified Father had difficulty following visitation guidelines:  "As it is noted in the report, Father has not been compliant since the Agency's involvement in general."  The social worker explained:  "My concern is the father will continue to illustrate the same behaviors he has demonstrated up until now with whoever—if we don't have a safe monitored location, which places the children in danger, in harm."  When asked how Father has harmed the Children by ignoring visitation guidelines, the social worker explained:  "It's emotional and general neglect." "Father screams and yells at everybody, makes threatening behaviors towards adults. Children are crying while he's doing this."  The social worker clarified Father did not yell at the Children.

After the evidentiary hearing, the Agency asked the juvenile court to sustain the petition, declare dependency, and terminate the proceedings with exit orders. Mother submitted on jurisdiction but asked the juvenile court to strike the allegation regarding her mental health diagnoses, agreed with the Agency's recommendation regarding disposition, and reiterated her request for a restraining order against Father. Counsel for the Children also asked the juvenile court to adopt the Agency's recommendations regarding jurisdiction and disposition and to issue a restraining order.

14

Father argued the restraining order should not issue and he should not be excluded from the Children's lives.

## VI.

### THE JUVENILE COURT'S JURISDICTION AND DISPOSITION ORDERS; MOTHER'S APPEAL

The juvenile court sustained the petition with modifications (but did not strike the allegations regarding Mother's mental health issues), removed the Children from Father's custody, ordered family maintenance services for Mother and enhancement services for Father, ordered monitored visitation for Father, and denied Mother's request for a restraining order. The Agency, Mother, and the Children's counsel all objected to the court's ruling.

After the jurisdiction and disposition hearing, a separate hearing was held regarding the case plan and Father's visitation. The court adopted the Agency's proposed case plan. One of the elements of Mother's case plan was substance use testing: "Upon reasonable suspicion, you will submit to random drug/alcohol testing with an observed specimen collection as deemed appropriate by the assigned social worker. All drug/alcohol tests are to be negative for drugs/alcohol. [¶] The following will be considered positive tests: A required drug/alcohol test has been missed, a test where the presence of illegal drugs and/or alcohol is detected, a test where the presence of prescription drugs not prescribed for the person testing or [i]n excess of the amount prescribed by any one doctor for the person testing is detected, an adulterated or diluted urine sample is submitted, a urine sample insufficient for testing has been submitted, or a sample other than the client's own urine has been submitted. [¶] If you test positive, you will be required to complete a substance abuse treatment program approved by [the

15

Orange County Social Services (the Agency)]." Mother's counsel had objected to this element of the case plan at the jurisdiction and disposition hearing.[7]

Mother filed a timely notice of appeal. The Agency submitted a letter brief on appeal agreeing with Mother the juvenile court's order should be reversed: "[The Agency] was aligned with Mother below as to the termination of dependency and remains so aligned on the present appeal. [The Agency] requests this Court to remand the matter to the juvenile court with instructions to terminate dependency jurisdiction with the children remaining in the custody of Mother and with Father authorized monitored visitation by a professional monitor; frequency and duration of visits as well [as] any other relevant visitation-related orders to be determined by the juvenile court. [The Agency] does not otherwise oppose Mother's appeal."

DISCUSSION

I.

THE JUVENILE COURT ERRED BY FAILING TO ISSUE A RESTRAINING ORDER
PROTECTING MOTHER FROM FATHER

Section 213.5, subdivision (a) authorizes a juvenile court to issue a restraining order in the same manner as a domestic violence protective order. "Issuance of a restraining order under section 213.5 does not require 'evidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered the [petitioner or person to be protected].' [Citation.] It may be sufficient to show that the person to be restrained 'disturb[ed] the peace' of the petitioner [citation], meaning he or she engaged in conduct that destroyed the petitioner's ""'mental or emotional calm.'"" [Citation.] Section 213.5 is analogous 'to Family Code section 6340, which permits the

---

[7] The hearing on the approval of the case plan was not transcribed.

16

issuance of a protective order under the Domestic Violence Prevention Act . . . if "failure to make [the order] may jeopardize the safety of the petitioner."' [Citations.]" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.)

When a court grants a restraining order under section 213.5, the appellate court applies the substantial evidence standard to determine whether substantial evidence supports the factual findings, and applies the abuse of discretion standard to determine whether the order should have been issued. (*In re S.G., supra*, 71 Cal.App.5th at pp. 670–671.) "The substantial evidence standard of review takes on a unique formulation where, as here, 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals.' [Citations.] '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' [Citation.] Specifically, we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' [Citation.]" (*In re S.G., supra*, 71 Cal.App.5th at pp. 670–671.)

In this case, Mother's request sought a restraining order protecting her *and the Children*. The juvenile court denied the request in full.

The juvenile court found neither Mother nor Father was credible. The court did not believe the incident occurred as Mother had testified, with Father throwing two punches with a closed fist, although the court did believe Father had at least "laid a finger" on Mother in an inappropriate way. Therefore, we consider the evidence from sources other than Mother and Father.

When Mother called 911, the police dispatcher heard an ongoing argument and the Children crying in the background. The police who arrived at the apartment observed redness and blood on Mother's face. Mother was extremely upset and the

17

Children were crying. The social worker reported M.R. stated Father had pushed Mother against a wall, and had hurt Mother, M.R., and Jam.R.

In addition to the allegations regarding the June 25 incident, the petition, which was sustained by the juvenile court, alleged Father had a history of committing violence against others, including but not limited to his former girlfriend's son, a prior partner, and a police officer. The criminal records included in the Agency's reports address Father's prior felony child abuse conviction, 2005 conviction for battery on a peace officer, and 2007 conviction for battery against a partner.

In the Agency's ex parte request regarding visitation, it provided information about Father becoming hostile, belligerent, aggressive, intimidating, and combative whenever he was told something he did not agree with. Ultimately, the court entered an order requiring a security officer to be present at all visits and permitting the Agency to terminate future visits if Father engaged in inappropriate behavior.

In denying the restraining order, the juvenile court compared Mother to other victims of domestic violence ("And I've worked with victims long enough to know that there is a fear when there's financial control, when there is emotional control. I don't see that here"),[8] and suggested a belief Mother was using the June 25 incident to benefit her in the family court case ("the Court can't help but recognize that in family law, domestic violence can result in absolutely losing rights").

We would suggest caution in using such comparisons. As a panel of this court has previously noted: "'When evaluating the complexity of domestic violence relationships, not every case will be the same. . . . ' [Citation] [¶] We are also mindful of society's preconceptions that often damage the 'credibility of victim-witnesses who present on the stand in atypical and non-paradigmatic fashions.' [Citation.] We expect

---

[8] In arguing against the issuance of the restraining order, counsel for Father argued Mother was a mutual combatant who did not need protection from Father.

such victims to be 'sweet, kind, demure, blameless, frightened, and helpless' [citation] and 'not a multi-faceted woman who may or may not experience fear or anger' [citation]. 'These are the preconceptions that judges and jurors bring with them into the courtroom when they assess the veracity of a victim-witness's story.' [Citation.] We encourage continued diligence and education to guard against such preconceptions." (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 26.)

In light of the uncontroverted evidence noted above, Mother made the necessary showing for issuance of a restraining order protecting her from Father under section 213.5, subdivision (a). The order should have issued protecting Mother.

A review of the evidence with respect to the Children leads to a different result. As noted *ante*, the juvenile court found the parents not credible at the hearing, and at the conclusion of the jurisdiction/disposition hearing the juvenile court did not find the Father had caused injuries to Jam.R. as had been alleged in the petition. There was no evidence Father had ever been violent with the Children. Indeed, the Children reported enjoying visits with Father. Utilizing the standard of review set forth in *In re S.G., supra*, 71 Cal.App.5th at pages 670–671, the evidence was sufficient to support the trial court's denial of the restraining order as to the Children. We will therefore affirm in part and reverse in part the juvenile court's denial of the request for a restraining order, and remand the matter with instructions to the juvenile court to grant the restraining order as requested for Mother only.

## II.

### THE JURISDICTION ORDER MUST BE MODIFIED TO DELETE THE REFERENCE TO MOTHER'S MENTAL HEALTH STATUS

Mother challenges the court's jurisdiction order only to the extent it sustained allegation b-4, which reads: "The mother . . . has a history of mental health issues, which may be an unresolved problem. The mother reported being diagnosed with

19

anxiety, depression, and PTSD, that she has attended therapy in the past, but she is not currently attending any therapy."

Even when an appeal from a jurisdictional finding is moot, the appellate court has discretion to review the issue. (*In re D.P.* (2023) 14 Cal.5th 266, 273 (*D.P.*).) In *D.P.*, the juvenile court sustained a petition alleging under former section 300, subdivision (b)(1) the child was at risk of serious physical harm, damage, danger, and physical abuse. (*D.P., supra*, 14 Cal.5th at p. 274.) While the parents' appeal from the jurisdiction order was pending, they fully complied with their case plan and the juvenile court terminated the proceeding. (*Id.* at p. 275.) The appellate court dismissed the appeal as moot, and declined to exercise discretionary review because "the parents 'have failed to identify a specific legal or practical negative consequence resulting from the jurisdictional finding.'" (*Id.* at pp. 275–276.)

The California Supreme Court concluded because the stigma of the jurisdictional finding alone was not enough to avoid mootness, and the jurisdictional finding had no negative consequence that would be remedied by a favorable decision on appeal, the appeal was therefore moot. (*D.P., supra*, 14 Cal.5th at p. 278.) But the Supreme Court also held the appellate court has the "inherent discretion to decide certain challenges to juvenile court jurisdictional findings, notwithstanding mootness." (*Id.* at p. 285.) Relevant factors for the court to consider include (but are not limited to) whether the challenged jurisdictional finding could prejudice the appellant or impact current or future child welfare proceedings, whether the finding is based on allegations of "particularly pernicious or stigmatizing conduct," and whether only findings of "particularly severe conduct" are challenged. (*Id.* at pp. 285–286.)

The factors identified by *D.P.* weigh in favor of the exercise of discretion to address the challenged finding in this case. The jurisdictional finding Mother has unresolved mental health issues could prejudice Mother in what will almost certainly be an on-going dispute with Father regarding custody of the Children. This finding could

20

impact whether she is determined to have completed necessary case plan objectives in this case, and could be alleged in any later proceedings. Finally, while mental health issues and mental illness should not be viewed as pernicious or stigmatizing, the unfortunate reality is that once one is branded as having mental health problems, one is viewed differently by significant portions of society. We therefore elect to exercise our discretion to consider Mother's challenge.

The finding Mother has unresolved mental health issues and is not in therapy is unsupported by the evidence before the juvenile court. Mother voluntarily enrolled in therapy, participated in therapy, and indicated she would continue to so participate even after the case is dismissed. Mother told the Agency she had participated in therapy in the past to address the kidnapping and sexual abuse she experienced in her childhood by an unknown perpetrator, and to address postpartum depression. Mother resumed therapy after the domestic violence incident leading to this child welfare case. Moreover, even if Mother still suffered from any mental health issues, no evidence was presented to establish these issues posed any risk of harm to the Children.

III.

THE JUVENILE COURT DID NOT ERR BY ALLOWING THE PROCEEDINGS TO CONTINUE, WITH SERVICES PROVIDED TO FATHER

In its reports and at the close of the evidentiary hearing, the Agency asked the juvenile court to terminate the child welfare proceedings with exit orders. Counsel for Mother and the Children concurred with this recommendation. The juvenile court, however, did not terminate the child welfare proceedings, but instead continued the proceedings and ordered enhancement services for Father. Mother challenges the disposition order and the Agency agrees the juvenile court erred in failing to terminate the child welfare proceedings.

21

"The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).)

"Although the decision whether to terminate [jurisdiction] is considered discretionary [citation], use of the word 'shall' denotes a mandatory act [citation]. [¶] The Court of Appeal in *In re J.F.* (2014) 228 Cal.App.4th 202, 210, concluded '[t]he language of section 364 does not literally require that the precise conditions for assuming jurisdiction under section 300 in the first place still exist—rather that conditions exist that "*would* justify initial assumption of jurisdiction."' Section 364(c) does not simply refer to 'conditions' or 'any conditions' but states the court shall terminate jurisdiction unless the social worker proves that '*the* conditions *still exist* which would justify *initial* assumption of jurisdiction under Section 300.' (Italics added.) By using the phrase 'the conditions still exist,' the Legislature meant the conditions existing at the time of initial assumption of jurisdiction continued to exist at the time of the hearing, not that new conditions have arisen. Thus, we believe, the better interpretation of section 364(c) is that the court must terminate jurisdiction if the conditions that justified taking jurisdiction in the first place no longer exist. [Citation.]" (*In re D.B.* (2015) 239 Cal.App.4th 1073, 1085.)[9]

A juvenile court's decision whether or not to provide enhancement services to a parent is discretionary, but that discretion turns on the best interest of the child.

_____

[9] Mother's opening brief on appeal argues the governing statute is section 390, which provides: "A judge of the juvenile court in which a petition was filed, at any time before the minor reaches the age of 21 years, may dismiss the petition or may set aside the findings and dismiss the petition if the court finds that the interests of justice and the welfare of the minor require the dismissal, and that the parent or guardian of the minor is not in need of treatment or rehabilitation." Dismissals under section 390 are "'rare and usually occur only when the goal of protecting the child has been achieved without court intervention.' [Citation.]" (*In re Carl H.* (2017) 7 Cal.App.5th 1019, 1038.)

(*In re Destiny D.* (2017) 15 Cal.App.5th 197, 212–213; *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)

In continuing the case and providing services to Father, the juvenile court stated: "I'm also not closing the case. I'm not closing the case in part because there's a reason Social Services Agency brought it to court. And I also have to acknowledge Dad's had three lawyers since this case started. [¶] It is outrageous that it has taken this long to get to juris/dispo, through no fault of his. He's far from being an angel; but I have to acknowledge the fact there has not been a constant individual to reach out when there is an issue with visitation, when there is an issue with what is expected of him. [¶] Maybe he will thumb his nose in the Court's face for the next six months, and then my decision will be a lot easier. But I'm gonna make sure it is very clear today what is expected of him; and if he does not meet the requirements of this Court, then at that time the Court can—or the County can renew their request to close. And at that time I may be in a position to order sole legal, sole physical to Mother."

The court also stated: "But if you continue the way the last six months have gone, there is gonna be no doubt in my mind that they are each gonna ask to close this case with sole physical and sole legal (gesturing). And I will have no evidence before me to not grant them that request."

There is no question but that the juvenile court, given the then-current circumstances of this case, had the authority to terminate the child welfare proceedings and issue exit orders regarding custody and visitation. But the court's stated grounds for continuing the matter—specifically the domestic violence between the parents, Father's anger management issues, the delays in getting the case to jurisdiction and disposition, and Father's lack of a consistent attorney representing him in the proceedings—do not "'"exceed the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."'" [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

23

The child welfare proceedings were initiated because Mother and Father's relationship had become so violent it presented a substantial risk of physical or emotional harm to the Children and Father had unresolved anger management issues. At the time of the jurisdiction/disposition hearing, there was evidence Father would become hostile and combative whenever he disagreed with someone or something.

Mother testified Father's violent behavior was out of character, and there was no evidence Father had ever been violent toward the Children. Father had been engaged in regular visitation with the Children throughout the pendency of the case. The Children reported enjoying seeing Father during these visits. The juvenile court was well within its discretion to decide Father was entitled to additional services to address his anger management issues for the best interests of the Children.

The juvenile court did not abuse its discretion by failing to terminate the proceedings with exit orders.


IV.

### THE CASE PLAN SHOULD NOT HAVE REQUIRED MOTHER TO PARTICIPATE IN RANDOM DRUG TESTING

As part of the case plan, the juvenile court ordered Mother to undergo random drug and alcohol testing. Mother challenges this element of the case plan on appeal. "'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion.' [Citation.] In reviewing an order for abuse of discretion, we '"must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child."' [Citation.] 'The trial court is accorded wide discretion and its determination will not be

24

disturbed on appeal absent "a manifest showing of abuse." [Citation.]' [Citation.]" (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186–187.)

The appellate record does not support the imposition of a drug testing requirement for Mother. The petition did not allege any substance use problems as to Mother. By contrast, the petition did allege Father had a history of substance use issues, and the mother of his son of whom Father lost custody had used methamphetamine and prescription drugs; the juvenile court sustained those allegations. The Agency's reports do not raise any concerns regarding substance use by Mother. The Children's teenage maternal half-sibling denied any knowledge of substance use in the home. Mother denied any substance use. There was no testimony at the jurisdiction/disposition hearing regarding any substance use by Mother.

In the absence of any evidentiary support, the component of the case plan requiring Mother to drug test must be stricken from the disposition order. (*In re Sergio C.* (1999) 70 Cal.App.4th 957, 960 [drug testing order was abuse of discretion where only evidence of drug use by the father was the mother's unsworn and uncorroborated statement, and social services agency did not make any investigation]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172–173 [substance use component in disposition order was abuse of discretion when based solely on the mother's "somewhat out of the usual" behavior].) On remand, the juvenile court shall amend the case plan accordingly.


DISPOSITION

We reverse the trial court's order denying the issuance of a restraining order pursuant to section 213.5 as to Mother, and remand the matter to the juvenile court to issue a restraining order protecting Mother from Father.

We direct the juvenile court to modify the jurisdiction order to delete allegation b-4 from the petition, and otherwise affirm the jurisdiction order.

25

We direct the juvenile court to delete the case plan requirement that Mother undergo random drug and alcohol testing, and otherwise affirm the disposition order.


MOTOIKE, J.

WE CONCUR:


GOETHALS, ACTING P. J.


DELANEY, J.