Filed 1/22/24  In re I.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re I.D. et al., a Person Coming Under the Juvenile Court Law. | |
| | D082539 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J521021) |
| v. | |
| H.D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado and Elisa Molk, Deputy County Counsel for Plaintiff and Respondent.

No appearance for Minors.

# INTRODUCTION

This is the second appeal in a case we previously said was "impossible to describe, much less conclusively evaluate." Due in large part to limitations father R.D. (Father) placed on the flow of information to the San Diego County Health and Human Services Agency (Agency) about the therapeutic progress of the family, our assessment has not changed substantially.

In our prior decision we affirmed a jurisdictional order declaring three minor children dependents of the juvenile court under section 300, subdivision (b)(1) of the Welfare and Institutions Code[1] because there was "something going on in that household that creates a danger and a risk" to the children. We reversed a dispositional order placing the children in the care of Father because undisputed evidence suggested he was at the center of the "something going on" in the family household. We remanded the matter for further proceedings. On remand, the juvenile court determined the children's placement with Father on the condition that they live in the home of maternal grandparents was appropriate under the current circumstances.

Thereafter, the court denied a request by the Agency and the parents to terminate jurisdiction. It ordered the Agency to provide family maintenance services and authorized a referral for Father and the children to participate in therapy through the County's Treatment and Evaluation Resources Management (TERM) mental health program so the Agency could have better access to information on their progress. The court vacated the condition that Father and the children reside in the maternal grandparents'

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

home so the Agency could evaluate the family without that layer of supervision.

Mother appeals the order, contending there was no substantial evidence to support the court's findings that conditions continued to exist to justify continued jurisdiction. Although the Agency requested termination of jurisdiction in the proceedings below, it now supports the juvenile court's order and asks us to affirm.

We preliminarily conclude the juvenile court's placement determination on remand did not materially vary from our dispositional directions in the prior appeal. On the merits, we conclude substantial evidence supported the court's order continuing jurisdiction under section 364.

FACTUAL AND PROCEDURAL BACKGROUND

Because the complex family history provides important context for the issues in this appeal, we quote extensively from the factual and procedural background section of our prior decision. We then describe the events that occurred during and after the prior appeal.

"A. *Family History*

"In April 2022, the San Diego County Child Abuse Hotline received a report of neglect and abuse involving minors I.D. . . . , T.D. . . . , and A.D. . . . . A social worker from the [Agency] investigated the report, which included allegations that unknown individuals were entering the family's home and engaging in sexual activity with H.D. (Mother) while the children and Father slept. Father allegedly had video evidence of these activities, but he claimed he was unable to access the videos because people were breaking into his home, his phone and his camera system and deleting them. The videos that Father provided the social worker and police failed to show the

3

activities he claimed were recorded. Mother had no memory of the alleged activities.

"Father additionally maintained that 'car loads' of unknown individuals were going to the home where they tracked and stalked the family. He reported strange noises outside the home, claiming that a wire to the internet box was cut and window screens were damaged. The police were contacted, but they determined no crime had been committed. Father owns a rifle, and recently purchased a handgun and a shotgun to protect the family from people he claimed were coming near the home.

"The family has repeatedly relocated to various motels and relatives' homes to evade the unknown stalkers. Even so, Father believed these stalkers were able to locate the family. He told the children that strangers were around their home, that he had videos of them, and that Mother needed to be restrained so she would not contact or engage in sexual activities with them. He restrained Mother with tape, handcuffs, and a straitjacket, and locked her in a closet to prevent her from having sex with strangers. The children believed Father's claims, including that these 'safety measures' failed to work as Mother somehow escaped and then returned to her restraints. They reported trying to stay awake to ensure Mother did not get away, which adversely impacted their school attendance and participation.

"The two older children became angry after being told of Mother's alleged sexual activity with strangers, and both participate in therapy to address their emotions. I.D., the oldest child, was described as hypervigilant, terrified, anxious, and sad because of the events he believed were taking place around their house. He reported feeling responsible for protecting his younger siblings, and experiencing nightmares and trouble breathing due to anxiety. I.D.'s therapist diagnosed him as having an adjustment disorder

4

with mixed anxiety and depression. She confirmed that the issues reportedly occurring at home left him sleep deprived. Mother's psychiatrist and Father's therapist both expressed concern about the children's safety while residing in a chaotic home with parents who have untreated mental health issues.

"Mother had restraining orders against Father in 2009 and 2019 to protect her and the children from domestic violence. Father then completed services for domestic violence. He was psychiatrically hospitalized in 2019 where he was diagnosed with major depressive disorder and posttraumatic stress disorder. Although he had been prescribed psychotropic medication, he denied taking it currently because he did not think he needed it.

"During her interview, Mother requested that Father be present for emotional support. She had no key to the home and no cellphone, so she could not contact or invite strangers into the home. While she denied recalling the activities with strangers that Father reported, she believed some had happened as he described.

"Mother's psychiatrist diagnosed her with major depressive disorder and was evaluating her for dissociative identity disorder and/or schizoaffective disorder. She participated in therapy, and the therapist expressed concern that she was being manipulated psychologically by Father. The Agency was concerned that it appeared to be the same pattern of control that characterized the relationship when domestic violence was alleged in 2009. Then, . . . Father reportedly controlled and isolated Mother, subjecting her to continual surveillance.

"On May 11, 2022, the Agency requested and the court issued a protective custody warrant, removing the children from their parents' custody out of concern for their safety. It then filed a petition alleging that the children came within the provisions of section 300, subdivision (b)(1).

5

Specifically, the petition asserted that the children have suffered or were at risk of suffering serious physical harm or illness by the inability of the parents to provide regular care for children due to the parents' mental illness, developmental disability, or substance abuse.

"B.    *Detention Hearing*

"Two days later, on May 13, the court held a detention hearing.  The Agency recommended that the children be removed from their parents' care and that the parents be allowed supervised visitation.  These recommendations were based on concerns regarding the children's safety due to Father's continued and escalating pattern of control over Mother and both parents' declining mental health.  In the Agency's view, there was 'reason to believe that the children and [M]other are at risk of possible death if left in the [F]ather's care.'

"The court detained the children and ordered supervised visitation for each parent separately.  It expressed concern about the children's emotional well-being, including the anxiety, depression, and sleep disturbances they were experiencing.  The children were allowed to remain with the maternal grandparents and were to receive therapy without the presence of a parent. The parents were to receive psychological evaluations and were allowed to visit the children according to a schedule.

"C.    *The Agency's Reports*

"In June and July 2022, the Agency prepared and filed a jurisdiction/disposition report and a series of addendum reports.  The children continued to reside with the maternal grandparents and were interviewed multiple times.  I.D. reported ongoing domestic violence with Mother as the aggressor because she gets angry that 'no one believes her.' He reiterated his understanding that people were stalking the family and

6

breaking into their home, and said he felt exhausted, angry and sad. His mental health evaluation suggested that depression, anxiety, anger, and adjustment to trauma adversely affected his ability to function.

"T.D. believed he was in protective custody because the 'government' thought his parents were not keeping the children safe when they argued. He explained that they had cameras installed inside and outside the home to protect them from the strangers Father said were coming to the home. He reported feeling angry and sad, and his mental health evaluation concluded that anger was adversely affecting his ability to function.

"A.D. believed she was living with maternal grandparents because Mother had done ' "too much stuff" ' that was ' "kinda bad." ' She was otherwise unable to articulate what was happening with her parents. Her mental health assessment revealed multiple areas of concern that needed to be monitored.

"Although she had no independent recollection, Mother accepted Father's reports that she continued to escape from restraints to have sexual encounters with unknown individuals. She explained that she never experienced memory loss before January 2022. In May 2022, while seeking treatment at San Diego Mental Health Hospital, fentanyl was found in her system although she had no recollection of taking it. She declined to be treated on an inpatient basis. Later that month, Mother was taken to the hospital due to an overdose of her psychotropic medication. She claimed it was impulsive and 'mostly' an 'accident.' Since then, Father said he has taken responsibility for dispensing Mother's medication to avoid overdoses.

"In June 2022, Mother sought treatment at the hospital after feeling 'out of it.' Again, she tested positive for fentanyl without any recollection of taking it. Later that month, Mother woke up with bruising on her face, red

marks on her neck, and swelling on her eye, lips and leg/foot. She was taken to the hospital for evaluation and treatment and stated her belief that she was drugged and sexually assaulted by a neighbor, despite having no recollection of such an event. Mother, however, was reportedly handcuffed to Father that night as a 'safety' precaution. The injuries were determined have resulted from an assault, but police did not believe there had been a crime.

"Although the children exhibited some behavioral issues while living with the maternal grandparents, they felt safe and were sleeping better. They also said they wanted to be placed with their parents or Father. . . . .

"According to the Agency, 'the power and control dynamic that is typically present with domestic violence' was still apparent in the parents' relationship. Because the video evidence failed to support Father's claim of Mother's alleged sexual encounters, the Agency believed he was delusional or fabricating the encounters 'in an attempt to control [Mother] and maintain his power over her.' Of further concern was that Father's unsubstantiated allegations led the children and those in Mother's support system to question Mother's mental health. The Agency stated that the children 'have been significantly impacted by the parents' delusions and continue to suffer the emotional impact even while separated from the parents.' It concluded that 'it is not safe for the children to return home to their parents until they are able to consistently demonstrate that they are addressing their mental health over a period of time.'

"D. *The Parents' Psychological Evaluations*

"In June 2022, Mother and Father both completed psychological evaluations. Mother was diagnosed with schizoaffective disorder, depressive type with persecutory delusions, generalized anxiety disorder, personality disorder, primarily dependent, paranoid, and borderline features. The

8

evaluator concluded that Mother was 'exhibiting delusions due to her fixed beliefs which are contrary to evidence' and that her '[b]eliefs are based on information received from [Father] and via vague video and audio footage in which multiple collateral reporters, to include police officers and hospital staff, have been unable to depict [*sic*] such acts.' Mother is 'highly dependent in her relationship' with Father and put his needs 'above those of hers and her minor children.' She also 'expos[es] her children to frequent domestic disputes and arguments,' which 'last[ ] for hours at a time,' and 'allow[s] her children to witness her being restrained and boarded up to appease [Father's] fears of infidelity.' The evaluator believed that Mother should enroll in an inpatient, residential, or intensive day treatment program. It was also 'highly recommended' that she participate without Father 'due to concerns of ongoing domestic violence dynamics and potential for a shared psychotic disorder.'

"Father was diagnosed with a delusional disorder involving jealousy and persecution, a severe major depressive disorder, an unspecified trauma-related disorder, and antisocial personality traits. It was noted that, after he returned home following modification of the restraining order in 2021, 'there have been multiple allegations of [Father's] efforts to utilize power and control tactics upon the family, including efforts to convince [Mother] of the alleged sexual abuse, intruder, and escape delusions and including the children in the reported response to these beliefs.' In the evaluator's opinion, Father embraced 'beliefs that are without substantiation, are absent of supportive evidence, are highly implausible, and exceedingly resistant to challenge.'

"The evaluator continued, 'Given the history of substantiated domestic violence, as well as concerns over potential delusional behaviors and power

9

and control dynamics, . . . the veracity of his claims and the explanation of the motives for his actions has been repeatedly called into question. [Father's] flawed reasoning and possession of multiple firearms further cause concern that his impaired perceptions can lead to disproportionate reactions, potentially leading to use of the weapons.' Furthermore, '[t]he most emergent factor that resulted from [Father's] evaluation is the presence of fixed false beliefs related to the sexual indiscretions of his wife, the uninvited intrusion by unknown individuals [in]to the family home, hypervigilance and paranoid ideation about the safety and security of the home, and the unfortunate drawing in of his two eldest children [in]to the delusional beliefs and their respective efforts to address their [F]ather's misguided concerns.' Father 'struggles to appreciate the severity of his actions as abusive or neglectful toward his children.'

"The evaluator recommended that Father engage in cognitive-behavioral therapy, metacognitive training, and pharmacological interventions to address his delusional disorder. A referral to a domestic violence offender's group was recommended '[d]ue to the dynamics of power and control in the relationship, documented by previous domestic violence, issues of limiting [Mother's] access to her family, telephone, and periods in which she had been physically restrained, handcuffed, placed in a straightjacket, and/or confined and barricaded in a locked room, unfounded and delusional accusations of infidelity without justification, and introduction of the dynamic to their children, resulting in their internalization of Father's beliefs[.]'

"E.    *The Contested Hearing*

"In July 2022, the court held a contested jurisdictional and dispositional hearing where the Agency's reports and the parents'

10

psychological evaluations were entered into evidence. The Agency's recommendations were supported by testimony from the social worker. Father testified about the services he was receiving and his relationship with the children. He also confirmed that he administered Mother's medication and drove her to appointments. He maintained that strangers were coming into his house at night to have sexual encounters with Mother, and that the strangers followed them when they moved to different hotels and to paternal grandparents' home.

"At the hearing, the Agency argued that no progress had been made since the children were detained, pointing out that Father still believed Mother was escaping at night and that she could not care for herself without his management and assistance. The Agency agreed with a psychologist who evaluated Father and concluded that his false beliefs and behavior posed a risk to the children. Minors' counsel recognized that a bond exists between Father and the children, but also noted that it led the children to share in Father's delusions. She joined the Agency, agreed with the evaluator that Father posed a risk of harm to the children, and requested that they be removed from parents.

"Counsel for each parent argued that the court should not take jurisdiction, but that if it did both parents should have unsupervised visits. Although Father's counsel acknowledged there was 'obviously something occurring in this household,' he asserted that the children had never been harmed physically and that Father's behavior was that of a concerned father and husband. He did not address the evaluator's finding that Father's beliefs were delusional, but instead maintained that Mother's mental health issues justified Father's actions and beliefs.

"Prior to its ruling, the court asked Father's attorney to comment on Father's psychological evaluation because it was the 'only professional opinion as to [Father's] mental health status.' Only then did counsel concede 'there does seem to be an embracing of beliefs that don't seem to be substantiated.' But the lawyer insisted that 'Father did not ask the children to become involved in this' instead, 'they wanted to help.' He also stated that the evaluator did not 'believe the children's lives are in danger or the children would be physically harmed' by Father.

"The court recognized 'there is something going in that household' that 'creates a danger and a risk' and acknowledged the children have become a part of it. At the same time, however, it noted 'a jumble of confusion' as to 'what is the reality in this case.' The court ultimately found that notwithstanding this state of confusion, there was a preponderance of the evidence to sustain the petition under section 300, but not clear and convincing evidence to remove the children from both parents' care as is required by section 361.

"As a result, the court sustained the petition, made a true finding by preponderance of the evidence, and declared the children dependents of the court. The children were removed from Mother's care and placed with Father on condition that he live with the maternal grandparents. . . . ." (*In re I.D.* (Feb. 28, 2023, D080675) [nonpub. opn.] (*In re I.D. I*).) Mother appealed.

F.    *Progress During Appeal*

We now pick up where the story in the prior appeal ended. Mother was arrested in September 2022 after Father said Mother used her left knee to hit him in the groin area when she was at the grandparents' home. Father obtained a restraining order that allowed "for brief and peaceful contact and

12

to only communicate about the children for court-ordered visitation." However, it also allowed Father to take Mother to her appointments.

Law enforcement was called to the grandparents' home again in October 2022. Father reported that while Mother was having a manic episode, she pulled Father's pants down, punched him on the back several times, called him names, and used foul language. Two of the children witnessed the altercation, but were not interviewed.

Before a visit in November 2022, Mother reportedly secretly took a pill bottle and impulsively consumed all the pills. When she became unstable and passed out, Father called paramedics who placed her on a psychiatric hold and transported her to the hospital. She did not sign a release of information to allow the hospital to share the records of this admission with the Agency. Mother continued to keep her medications at the grandparents' home in a locked safe.

Because of continued violent incidents between the parents during visits, the social worker asked Father to leave the home during the visits. However, he remained nearby because he said his children "do not feel safe when he is not home."

For a hearing in January 2023, the Agency provided a status review report recommending continued jurisdiction over the children and that they remain with Father in the grandparents' home. The Agency also recommended that both parents sign releases of information for all service providers.

Father was "willing to participate in therapeutic services but [was] very guarded about his treatment." The Agency said he "continued to show signs of being overly controlling" of Mother and was resistant to suggestions that she needed independence.

Father said several times that he would sign releases of information to allow the Agency to obtain information from mental health providers, but he never signed them. Father told the social worker he had shared everything with his attorney who wanted to be "very 'selective' on what is shared with the Court/Agency." Father denied having a delusional disorder or antisocial personality traits. He said his treatment program diagnosed him with depression and anxiety and that he was taking medication for those issues.

The Agency was unable to confirm his therapeutic progress. The medical director of Father's treatment program told the social worker that there was "no clinical movement" with Father. He continued to deny any domestic violence or issues within his family. The director said Father and the children were "very guarded." She said Father was "documented to have a personality disorder." When the social worker informed Father of the director's comments, he said this was new information to him. He commented that he did not know why the director spoke with the social worker because he had not signed a release of information.

Mother had limited contact with the social worker because she still did not have a cell phone and was "only reachable when she is around father." Mother remained homeless but stayed close to the maternal grandparents' home. She declined offers to go to a shelter or residential treatment program because she did not " 'trust herself' " in a setting with men and women.

The children said they do not "feel safe" when Father is not home. The youngest child said Mother does not live with the family and goes to the hospital because her " 'head is not right' " sometimes. The oldest child reported that things were " 'boring' " at home because there had not been any incidents recently. A therapist for one of the children reported there were "many complex family dynamics that are concerning" including the fact that

the children seem to think the situation is "normal" and Father is protecting them from their mother.

Father wanted to move out of the maternal grandparents' home and relocate the family out of state. The children wanted to remain with Father and did not think the Agency needed to be involved any longer.

The Agency recommended continued monitoring the family due to "ongoing concerns for the parent's mental health and safety." The Agency remained "concerned with the parents['] mental health and resistance to allowing the Agency to receive information about their treatment and progress."

The juvenile court continued jurisdiction and ordered the parents to sign releases of information for any services provided in accordance with the case plans so the Agency could assess progress sufficiently.

G. *Decision on Mother's Prior Appeal*

In February 2023, we reversed the juvenile court's dispositional order for lack of substantial evidence. We concluded there was no evidence supporting Father's claims that Mother engaged in risky behaviors, required restraints to keep her safe, and escaped her physical restraints and returned to captivity before the family awoke or that intruders entered the home undetected or stalked the family. However, Father persisted with delusions that these events occurred and convinced Mother and the children of the truth of these "fixed false beliefs." There was undisputed evidence that the children suffered emotional harm because of either Father's "fixed false" beliefs or from a family dynamic that is "historically rife with domestic violence." Therefore, we concluded "any reasonable judge applying a clear and convincing evidence standard would necessarily conclude that returning the children to Father's custody posed a substantial risk to their well-being."

15

We were concerned that an order requiring Father to live in the home of maternal grandparents did not "address Father's multiple mental health diagnoses, or . . . keep the children safe from 'adopting and acting on' his 'delusional belief system.'" Because there was overwhelming evidence that Father represented a substantial risk to the children, we reversed the order and remanded the matter for further proceedings consistent with our opinion. We recognized that on remand, the juvenile court was required to base its decision on facts existing at the time of the further proceedings.

H.    *Special Proceedings Following Remittitur*

After receiving the remittitur with our decision, the juvenile court ordered the Agency to prepare a report with updated information regarding potential dispositional options. Father obtained new counsel.

The Agency submitted an addendum report in June 2023, but made no new recommendations. Father was participating in weekly individual therapy and was taking a medication used to treat depression and anxiety. The children also received therapy.

Mother was still homeless and the Agency reported she had "concerning mental health concerns." She was arrested in April 2023 and served time in jail for violating the restraining order. Mother did not want to leave her parents' home after a visit because she did not know where to go. She again tested positive for fentanyl, but again did not recall using any drugs. She said she continued to have "episodes" where she blacks out and cannot remember anything.

The Court Appointed Special Advocate (CASA) for the minors expressed concerns to the Agency in May 2023 after he had a conversation with the director of the clinic where Father and the children received

16

therapy.[2]  The children were guarded, which the medical director thought was a protective mechanism that allowed them to cope with the trauma and emotional abuse they had endured.  The director told the CASA that the providers had "concerns for the children's safety while with the father in the maternal grandparents['] home."  Although the director could not give concrete examples of how the children were unsafe, she said Father is very "controlling and manipulative."  The director referred to Father's psychological evaluation several times saying, " 'Just read the psych evaluation and you would understand.' "

The medical director also spoke to the social worker.  She did not allow the social worker to speak directly to the family's individual therapists, but confirmed the dates of service.  The medical director confirmed Mother was discharged from treatment because she achieved all her treatment goals and objectives.  When the social worker questioned how that was possible if Mother continues to have untreated severe mental illness, the director responded, " 'What is her mental illness[?]' "

When the social worker asked if there were concerns about the safety of the children in Father's home, the director said, " 'No concerns.' "  The social worker followed up to ask why she expressed concern about the children's safety to the CASA. The director responded, " 'Have you read the psychological evaluations?' "

The social worker pressed the director for an update since the psychological evaluation.  The director said, " 'The therapist[s] report the children have a history of trauma and there is a lot of resistance from them. The only concerns we mostly have is the partner conflict between the parents.

---

[2]    Father and the children attended therapy at a clinic that is not an approved provider through TERM.

The children do not report feeling unsafe with their father.'" When asked if they had documentation or concerns that Father continued to have delusional thoughts, the director said, " 'No just grandiosity.' " Since Father denied delusional thoughts, the primary clinical concern was partner conflict. The director thought Mother and the children would benefit from family therapy along with the grandparents.

Father told the social worker he would like to continue therapy for himself and the children when the case closes. The children reported feeling safe around Father.

The Agency's addendum report concluded that Father "has addressed his mental health concerns by engaging in medication management and ongoing individual therapy. There [have] been no reports of him having delusional thoughts or paranoia. The [F]ather's therapist recognizes progress within the [F]ather's mental health and denied any clinical symptoms of delusional thoughts."

Mother reportedly "continues to have untreated mental health which makes her 'blackout' and she is unaware of who she is with or what she is doing during those times. The [M]other claims that she is unsure how she is testing positive for drugs and reports that she feels scared that these 'episodes' continue to happen." The Agency said Mother continued to refuse to receive help from a co-ed facility. It also did not have a direct way to contact Mother. The addendum report concluded by saying, "It is evident that this case continues to have many complicating factors and the family has been greatly impacted from untreated mental health. But ultimately, the children report that they feel safest when their father is around and they are aware of their mother's mental health."

18

The court held a special hearing on June 22, 2023 to consider dispositional options. The Agency did not recommend removal of the children from Father based on how the case stood at the time. The Agency's said there was not clear and convincing evidence of risk to the children if the court continued to place them with Father, on the condition he continued to live with the maternal grandparents. Counsel for both Mother and Father submitted on the Agency's recommendation.

Minors' counsel also submitted on the placement recommendation because the children had been placed with Father for almost a year without significant concerns. Minors' counsel expressed concerns about the appropriateness of the therapeutic services provided to the family, but indicated that was an issue for the family maintenance review.

The court commented that Father "is addressing his mental health issues. He is in therapy and on medication. And the children feel safe" in Father's home. Based on this information, the court found "there is not clear and convincing evidence to remove the child[ren] from the Father." The court determined the placement of the children with Father was appropriate on the conditions that he and the children remain with the grandparents and that Father continues to comply with the case plan, including remaining on medication and engaging in therapy.

I.    *Family Maintenance Review*

The following month, in a July 2023 status review report, the Agency recommended the children remain with Father and that the court terminate jurisdiction.

Father reportedly communicated with the Agency during the review period, participated in weekly individual therapy, and took medication as directed. He called the police to the family home several times during the

19

review period with allegations that Mother violated the protective order by refusing to leave or coming to the home outside of visitation times. On some occasions, Mother refused to leave the home after a visit with the children or she was found on the property or sitting outside the home. On one occasion, the caller said people were sleeping in a car outside the home and they suspected it was Mother. However, she was not identified in the car. The report also indicated the police were called in May 2023, because "the mother was believed to be in the home the night before with another individual."

Father told a social worker he wanted to divorce Mother because her mental health concerns were not being met and he felt she was a safety risk to the children. He wanted to relocate to a different state when the case was closed. He said he wanted to start over and live independently with his children in a more affordable location.

The report again summarized the conversation the social worker had with the medical director of the clinic where Father received therapy. Because the director reported that Father denied having delusional thoughts, the report concluded the primary concern was with "partner conflict."

The Agency stated Mother had inconsistent communication during the review period because she remained homeless and did not have access to her own cell phone. Mother was unsure of her mental health diagnosis since she received several throughout her various hospital stays. She was not connected to any outpatient mental health program. She was discharged from the program where Father and the children attend therapy after she met her case objectives.

The children reported feeling safest when their father was around and said he is very honest and trustworthy. The older children were "more aware of the mother's mental health needs." They said they loved her, but at times

she was not well and caused problems for the family. They expressed a desire to move out of their grandparents' home and to move to a different state.

The Agency reported Mother made no progress in her therapeutic treatment case plan. Although the social worker confirmed that Mother was discharged from a program after she met her therapeutic goals, the social worker noted she had gone to the emergency room and hospital several times during the review period for medication adjustments or suicidal ideations. The Agency acknowledged Mother made some progress with individual therapy because she was discharged after meeting therapeutic goals. However, Mother reported she did not feel as though she should have been discharged from the program and felt discouraged that she was unable to receive treatment for her mental health. The Agency assessed that Mother made no progress in substance abuse testing because she does not have a phone for the Agency to call to ask her to randomly drug test. She did not know how she tested positive for fentanyl in April 2023 because she did not remember taking the drug. Mother wanted to continue to work on stabilizing her mental health and rebuilding her relationship with her children and Father.

The Agency reported that Father made progress in his case plan. The case plan recommended pharmacological treatment to alleviate symptoms associated with delusional disorder. Father denied having a delusional disorder, but reported he was taking medication for depression and anxiety along with sleeping medication. He said he attended regular therapy sessions and had made progress. Father said he wanted to continue with therapy for himself and the children after the case was closed. But he wanted to move out of the grandparents' home and out of state.

The status report concluded that Father was attentive to the needs of the children. He had not displayed delusional thoughts or behaviors during the review period and reported taking medication regularly. The Agency indicated Father "has become less guarded and more willing to share about his own mental health and needs for his children." It believed Father had "gained insight" into the importance of protecting the children from untreated mental health issues. The Agency hoped Father would continue to receive mental health treatment for himself and the children and protect them from further domestic violence.

The Agency was concerned that Mother "has been unable to stabilize her mental health" and that she reported episodes of "blacking out" where she did not remember using drugs or engaging in unwanted sexual encounters. It reported she was "unwilling to have a phone where service providers can contact her" and she was not willing to receive referrals and assistance. It hoped she would seek out "intensive mental health treatment for herself." The Agency recommended termination of jurisdiction with exit orders providing Father with full legal custody of the children.

The CASA reported that the therapy director and the therapy staff believed there were serious emotional and mental health concerns within the family and that everyone in the family needed to be in therapy, including the maternal grandparents. The CASA expressed hope that the Agency would provide additional support and resources for the family.

At the scheduled family maintenance review hearing, minors' counsel, acting as the minors' guardian ad litem, requested a document trial to address whether to terminate jurisdiction or keep the dependency case open.

The contested hearing proceeded on July 27, 2023. The court received into evidence the substantive Agency reports as well as our opinion from the

prior appeal. The Agency argued in favor of terminating jurisdiction. Father and Mother joined.

Minor's counsel, as guardian ad litem, asked the court to keep the case open for an additional six months. Counsel noted that Father had participated in services, but there were not a lot of substantive updates about his progress. He selected his own therapeutic provider and wanted to control the flow of information to the court. Counsel recognized that Father made some progress, but believed there was still an issue about whether he understood the severity of the issues at the beginning of the case. Counsel pointed out that while the children never reported feeling unsafe with Father, some of the issues identified in the psychological evaluation included a "shared belief system" and "enmeshment between the father and the children and the shared belief systems." Minors' counsel argued the court should retain jurisdiction to supervise any move outside of the safety mechanism of living with the grandparents. She also recommended the court order therapy through the County's TERM mental health program or, alternatively, try to get more concrete information from the existing provider.

Before making its ruling, the court explained it was required to decide by a preponderance of the evidence whether the conditions that justified assumption of jurisdiction still existed. The court observed that Father was engaged in therapy and appeared to meet the needs of the children in the current setting. But it expressed concern that it did not have substantial updates about the therapeutic progress of the family, noting how the children had suffered extensive trauma.

The court noted a comment in the recent report indicating the police were called in May 2023 because "Mother was believed to be in the house the night before with another individual." Although there was only limited

information about this incident, the judge thought it "raises concerns" about whether this was a delusion.

Ultimately, the court determined that minors' counsel met her burden of establishing by a preponderance of the evidence that the conditions that justified the assumption of jurisdiction continued to exist or are likely to recur if supervision of the dependency court was withdrawn. It decided to maintain jurisdiction for six months and ordered the children placed with Father. At the same time, however, it vacated the condition that the children reside with Father in the grandparents' home.

The court did not believe there was an issue of lack of services, but a lack of information about the services the family received. It ordered continued family maintenance services and authorized the Agency to refer Father and the children to TERM therapy. Mother appealed the order.

## DISCUSSION

A. *The Proceedings After Remand*

Before we address the merits of Mother's appeal, we mention the somewhat unusual posture of the case. As stated, we previously reversed the dispositional order placing the children with Father after concluding "any reasonable judge applying a clear and convincing evidence standard would necessarily conclude that returning he children to Father's custody posed a substantial risk to their well-being." We remanded for further proceedings consistent with our opinion. (*In re I.D. I, supra.*) Yet, after remand, the juvenile court determined that placement of the children with Father was appropriate on the condition that they live with maternal grandparents and that he complies with his case plan.

Ordinarily, "[w]hen there has been a Decision upon appeal, the trial court is reinvested with jurisdiction of the cause, but only such jurisdiction as

24

is defined by the terms of the remittitur.  The trial court is empowered to act only in accordance with the direction of the reviewing court; action which does not conform to those directions is void."  (*Hampton v. Superior Court in and for Los Angeles County* (1952) 38 Cal.2d 652, 655.)  "Where a reviewing court has remanded a matter to the trial court with directions '. . . the trial court . . . is bound to specifically carry out the instructions of the reviewing court . . . .  [Any] material variance from the explicit directions of the reviewing court is unauthorized and void.' "  (*Coffee-Rich, Inc. v. Fielder* (1975) 48 Cal.App.3d 990, 998.)  To determine if any variance in the execution of an appellate ruling is "material," the appellate court's order must " 'be read in conjunction with the appellate opinion as a whole' " and "the order considered in the framework of the statutory scheme to which it relates."  (*In re Candace P.* (1994) 24 Cal.App.4th 1128, 1132.)

In the dependency context, the statutory scheme "exists to protect children from abusive parents, but it also gives parents who have made mistakes a second chance to raise their children."  (*In re Ryan K.* (2012) 207 Cal.App.4th 591, 597.)  It requires the juvenile court to "undertake 'recurrent reviews of the status of parent and child.' "  (*Ibid.*)  And the scheme permits the juvenile court to adjust its determinations even while an appeal is pending.  (*Ibid.*)  Therefore, " 'when an appellate court reverses a prior order of the [juvenile] court on a record that may be ancient history to a dependent child, the [juvenile] court must implement the final appellate directive in view of the family's current circumstances and any developments in the dependency proceedings that may have occurred during the pendency of the appeal.' "  (*Ibid.*)

In this case, we based our prior decision on the facts existing at the time of the dispositional hearing, which we determined from the record on

25

appeal.  The juvenile court was required to make a new placement decision on remand "based on the facts existing at the time of the further proceedings." (*In re M.V.* (2022) 78 Cal.App.5th 944, 971, fn. 9.)

Here, the court set a special hearing and ordered the Agency to prepare an updated report.  According to the report, Father was participating in weekly individual therapy and was taking medication as prescribed.  The children were also participating in therapy.  Although the medical director expressed generalized concerns based on Father's psychological evaluations, she did not articulate current safety concerns for the children while in Father's home.  When asked if the therapists had documentation or concerns that Father continued to experience delusional thoughts, the director said, " 'No, just grandiosity.' "  Father denied delusional thoughts, so the primary concern was partner conflict.

Since Father made progress with his mental health concerns "by engaging in medication management and ongoing individual therapy" and there were no reports of delusional thoughts or paranoia, the Agency did not believe there was clear and convincing evidence of risk to the minors if they were placed with Father on the condition that they live with the maternal grandparents.  Minors' counsel submitted on the recommendation since the children had been placed with Father for nearly a year "without significant concerns."

After considering evidence of the current circumstances, the court found there was not clear and convincing evidence to remove the children from Father.  Their current placement with Father was appropriate on the conditions that they remained with the grandparents and that Father continued to take medication and engage in therapy.

The record regarding Father's progress during the prior appeal is not as fulsome as we would hope, perhaps due to limitations Father placed on the flow of information to the Agency. Under the circumstances, however, we cannot conclude the disposition order on remand materially varied from our decision. We directed the court to conduct further proceedings consistent with our opinion. The court complied with that direction and determined the placement conditions were appropriate based on current circumstances.

B. *Substantial Evidence Supported Continued Jurisdiction*

Mother contends the court erred in continuing jurisdiction over the children at the family maintenance review hearing. She specifically contends there was not substantial evidence showing the conditions which caused the assumption of jurisdiction continued to exist or were likely to recur if jurisdiction was withdrawn. Although the Agency recommended termination of jurisdiction in the proceedings below, it now agrees with the court's order and contends substantial evidence supports continuing jurisdiction.

The purpose of juvenile dependency statutes is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, neglected, or exploited, and to ensure the safety, protection, and emotional well-being of children who are at risk of such harm. (§ 300.2, subd. (a).) "When the juvenile court takes jurisdiction over a child at the disposition hearing but does not remove the child from the custody of the previously custodial parent, section 364 governs review hearings. (§ 364, subd. (a).)" (*In re J.M.* (2023) 89 Cal.App.5th 95, 110.) The court reviews the matter every six months to determine whether "continued supervision is necessary." (§ 364, subds. (a), (c).)

"At a section 364 hearing, 'the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless

27

[the Agency] establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction . . . or that those conditions are likely to exist if supervision is withdrawn.' (§ 364, subd. (c).) Thus, '[w]here . . . the [Agency] recommends termination of jurisdiction, termination will be the "default result" unless either the parent, the guardian, or the child objects and establishes by a preponderance of the evidence that conditions justifying retention of jurisdiction exist or are likely to exist if supervision is withdrawn.' " (*In re J.M., supra,* 89 Cal.App.5th at pp. 110–111 quoting *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163.)

The court here found minor's counsel met the burden of establishing by a preponderance of the evidence that the conditions justifying the court's jurisdiction continued to exist. We review the court's evidentiary findings under section 364 for substantial evidence. (*In re D.B.* (2015) 239 Cal.App.4th 1073, 1086; *In re N.S.* (2002) 97 Cal.App.4th 167, 172.)[3]

We conclude there is ample substantial evidence to support the juvenile court's order continuing jurisdiction. The issues that brought the family within the jurisdiction of the court included concerns about the mental health of both parents and parental conflicts that posed a risk to the children's

---

3    Mother cites *In re C.W.* (2019) 33 Cal.App.5th 835, 863 for the proposition that we should apply the abuse of discretion standard of review for an order regarding terminating jurisdiction. The issue in that case involved the juvenile court's exit orders regarding custody and visitation, which accompanied an order terminating jurisdiction. (*Id.* at pp. 863–864.) The appellate court actually determined there was no substantial evidence to support the juvenile court's factual finding that the conditions which justified the original no longer existed as to the father. Since was no evidence the father ever received treatment to address his sexually inappropriate behavior toward children or that his history no longer posed a risk to his child, the appellate court found the juvenile court abused its discretion in awarding sole permanent custody of the child to the father. (*Id.* at pp. 863–864.)

physical and emotional wellbeing.  Although it appears the family has made some progress, the record is incomplete and does not demonstrate the jurisdictional issues are resolved.

Although Father reportedly participated in therapeutic services and took medication, he did so through a provider *he* selected.  He did not sign releases of information to allow the provider to share the details of his progress or that of the children with the Agency.  This hindered the ability of the Agency and the court to assess their progress and compliance with the case plan.  Father continued to manifest a desire to control the information shared with the Agency and the court.  Interestingly, he reportedly became more open with the Agency after the issuance of our prior opinion.

The fact that the children report feeling safe in Father's care is a good thing.  However, the director for the private therapy program reported the children still had extensive trauma despite engaging in therapy and they were resistant and avoidant at times.  She expressed ongoing concern about partner conflict between the parents and recommended family therapy for Mother, children, and the grandparents.

The director's concerns about the children's trauma were reinforced by the social worker's interviews.  The children felt it was normal for Father to protect them from Mother.  One child expressed continued anger toward Mother and blamed her for the dependency case.  Another child indicated home was "boring" when incidents that brought them into protective custody did not occur.  The children's apparent unresolved trauma justifies continued jurisdiction of the court.

Additionally, although Father obtained a restraining order against Mother, the order still allowed the parents to have contact, which raised concerns about ongoing parental conflicts.  Additionally, police were called on

29

several occasions because Mother stayed near the home despite the restraining order.

Whether Father still controls Mother's medication administration is unclear, but her medication was still kept at the grandparents' home where the children reside. Even with this measure, Mother reportedly overdosed on medication while the family was present. She also again tested positive for fentanyl without recalling that she took the controlled substance.

Father resisted the social worker's suggestion that Mother should achieve independence from him. Mother still did not have access to a cell phone when she was not with Father, which hampered the ability of the Agency to maintain contact in order to assess her progress on drug testing or other issues. It is entirely appropriate and reasonable for the juvenile court to retain jurisdiction to monitor the apparently ongoing and concerning power dynamic between the parents, which continues to place the children at risk.

Furthermore, without corroborating information about the parents' mental health progress, there remain significant concerns about the emotional and perhaps physical trauma the minor children may continue to suffer because of the chaotic family dynamic. As the juvenile court noted, a recent status report indicated police were called to investigate suspicions that Mother and another individual entered the grandparents' home during the night. It is unclear whether this was reality or a delusional belief. Continued jurisdiction to allow the Agency and the court to attempt to access current mental health information about the parents and the children is eminently reasonable. We can only hope the family is taking advantage of the TERM referrals to not only address their mental health needs, but to allow the Agency and the court to evaluate their progress.

The court's decision to remove the condition that the family live with the maternal grandparents while under the continued jurisdiction of the court was well within its discretion. It is prudent for the court to maintain supervision over the family during this period of transition so the Agency and the court may evaluate the safety of the children without that layer of protection.

There was substantial evidence that the children remain at risk due to the original issues that brought them within the court's jurisdiction. For this reason, the juvenile court appropriately continued jurisdiction.

## DISPOSITION

The order is affirmed.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.